Jean M. MARRIS, Petitioner-Appellant-Petitioner,

v.

CITY OF CEDARBURG, a municipal corporation and The Board of Zoning Appeals for the City of Cedarburg, Respondents-Respondents.

Supreme Court

*No. 91–1160. Oral argument March 2, 1993.—Decided May 11, 1993.*

(Also reported in 498 N.W.2d 842.)

16

For the petitioner-appellant-petitioner there were briefs by *Leslie F. Kramer, Frederick T. Rikkers* and *Tomlinson, Gillman & Rikkers, S.C.,* Madison and oral argument by *Frederick T. Rikkers.*

For the respondents-respondents there was a brief by *Lowell K. Levy, Dennis H. Milbrath* and *Levy &*

*Levy, S.C.,* Cedarburg and oral argument by *Dennis H. Milbrath.*

Amicus curiae brief was filed by *Curtis A. Wityn-ski,* Madison for the League of Wisconsin Municipalities.

SHIRLEY S. ABRAHAMSON, J. This is a review of an unpublished decision of the court of appeals filed March 11, 1992, affirming a judgment of the circuit court for Ozaukee County, Warren A. Grady, Circuit Judge. The circuit court affirmed a decision of the Board of Zoning Appeals for the City of Cedarburg (the Board) determining that Jean E. Marris's property had lost its legal nonconforming use status[1] because total lifetime structural repairs or alterations to the property, as defined by the city ordinance, exceeded 50% of the property's current assessed value. The court of appeals also rejected Marris's argument that she was deprived of a fair hearing before the Board when the chairperson of the Board failed to recuse himself.

The case presents two issues: (1) Did the chairperson of the Board prejudge the matter and create an impermissibly high risk of bias so that his refusal to recuse himself deprived Marris of a fair hearing? (2) What improvements to Marris's property constitute "structural repairs or alterations" under the city of Cedarburg ordinance which limits the total lifetime

---

[1] A legal nonconforming use is usually defined in the law of zoning as a use that lawfully existed on the effective date of a zoning ordinance and that may be maintained thereafter although it does not conform to the use restrictions of the ordinance. *City of Lake Geneva v. Smuda,* 75 Wis. 2d 532, 536–37, 249 N.W.2d 783 (1976); *Walworth County v. Hartwell,* 62 Wis. 2d 57, 60, 214 N.W.2d 288 (1974).

structural repairs or alterations to not more than 50% of the property's assessed value?[2]

We conclude that Marris was denied her right to a fair hearing. Statements made by the Board's chairperson indicated that he had prejudged Marris's case and created an impermissibly high risk of bias. Under these circumstances he should have recused himself in order that Marris have a fair hearing. Accordingly, we reverse the court of appeals' decision. We remand the matter to the circuit court with instructions to remand it to the Board to determine, consistent with our interpretation of the city of Cedarburg zoning code, whether the total lifetime structural repairs or alterations to Marris's property exceed 50% of the property's current assessed value.

---

[2] The respondents are the City of Cedarburg and the Board of Zoning Appeals for the City of Cedarburg. In discussing the respondents' arguments, we refer to the Board of Zoning Appeals for the City of Cedarburg and the City of Cedarburg collectively as the Board.

At the court of appeals the meaning of "current assessed value" and the 50% calculation were litigated. Neither party challenges the court of appeals' interpretation of these provisions.

Marris also argues in this court that the Board and the City of Cedarburg are estopped from including in their calculations the work performed in 1972 and 1977. We have examined her arguments, and we agree with the circuit court and the court of appeals that she has not set forth sufficient grounds to establish estoppel. *McKenna v. State Highway Commn,* 28 Wis. 2d 179, 135 N.W.2d 827 (1965); *Snyder v. Waukesha Zoning Board,* 74 Wis. 2d 468, 247 N.W.2d 98 (1976); *State v. City of Green Bay,* 96 Wis. 2d 195, 291 N.W.2d 508 (1980).

## I.

The material facts are not in dispute for purposes of this appeal. Marris owns real property located in the city of Cedarburg, Ozaukee County, Wisconsin. The property is zoned for residential use. Two buildings exist on the property, a residence located on the front portion and a second building on the rear portion. The rear building is the subject of this case.

When Marris purchased the property in 1976, her offer to purchase was contingent upon obtaining approval from the Cedarburg Plan Commission to use the rear building as office space for her construction and real estate businesses.[3] After Marris submitted plans to the Commission, it granted her petition for a substitute legal nonconforming use. Marris took possession of the property in 1977. Over the next two years, she gradually converted the building to office use.

In 1988, Marris began converting the rear building into office space for three rather than two businesses. She did not seek or obtain building permits for this project. Alerted by a neighbor's complaint, the city building inspector examined the rear building. Because no building permits had been issued and because the effect of the construction on the structure's status as a legal nonconforming use was unclear, the building inspector issued a stop work order. The building inspector advised Marris that any use of the building other than that permitted by a proper continu-

---

[3] The former owner had, since 1972, used the rear building as a retail flower shop, which had legal nonconforming use status. Prior to 1972, the rear building had been used as a beer distributing company's warehouse. Originally, the rear building was used as a barn or a tool shed.

21

ation of the legal nonconforming use would violate the zoning code. Consequently, Marris sought approval from the city Plan Commission for the proposed change in the use of the building.

On March 7, 1988, the Plan Commission recommended that the Board conduct a public hearing and asked the Board for an interpretation of the nonconforming use provisions of the county zoning ordinance at issue in this case. The Board conducted public hearings on April 12, 1988, and May 3, 1988, and conducted an on-site inspection of the building in question. At the May 3, 1988, hearing, the Board decided the property had lost its legal nonconforming use status. This oral ruling was subsequently incorporated in a written decision dated June 17, 1988. Marris sought judicial review and, in a decision dated May 31, 1989, the Ozaukee County circuit court held that the Board had erred and remanded the case for further findings consistent with its opinion.

After the case was remanded, the Board held a closed meeting on October 3, 1989, during which the assistant city attorney presented a status report on Marris's case. At the close of the meeting, the Board scheduled a public hearing for December 5, 1989, to determine whether to confirm the stop work order and whether to retain the legal nonconforming use status of Marris's building.

By letter dated November 17, 1989, Marris's attorney requested Board chairperson John Kuerschner to recuse himself from the December 5, 1989, hearing. The request was based on comments Kuerschner had made at the Board's closed meeting on October 3, 1989. At the December 5, 1989, hearing, Marris's attorney renewed his request that the chairperson recuse him-

self, but Kuerschner refused to do so, stating that he was impartial.

The Board reviewed the building inspector's video-tape of the property at the hearing on December 5 and heard Marris's testimony. The hearing was adjourned until December 14, 1989, when the Board conducted an on-site inspection of the property. On February 20, 1990, the hearing was reconvened and the Board heard additional testimony. Both parties filed briefs in lieu of argument.

The Board rendered its decision at a public hearing on March 27, 1990, and filed its written decision on May 4, 1990. The Board concluded that the lifetime structural repairs or alterations to Marris's property exceeded 50% of the current assessed value and that the property had therefore lost its legal nonconforming use status. For the second time, Marris petitioned the Ozaukee County circuit court for review.

In a written decision dated March 28, 1991, the Ozaukee County circuit court affirmed the Board's determination that Marris's property had lost its legal nonconforming use status because lifetime structural repairs or alterations to the property exceeded 50% of the property's current assessed value. Marris appealed to the court of appeals and then sought review in this court.

Further facts will be set forth in the discussion of each issue.

## II.

Since no statutory provision is made for judicial review of a local zoning board's decision, our review of the Board's action in this case is by way of certiorari. *State ex rel. Johnson v. Cady,* 50 Wis. 2d 540, 549–50,

185 N.W.2d 306 (1971). The scope of our review by certiorari is limited to determining the following: (1) Whether the Board "kept within its jurisdiction"; (2) whether the Board "acted according to law"; (3) whether the Board's action "was arbitrary, oppressive, or unreasonable and represented its will and not its judgement"; and (4) whether the evidence was such that the Board "might reasonably make the order or determination in question."[4] The phrase "acted according to law" has been interpreted as including "the common-law concepts of due process and fair play."[5]

The parties agree that Marris was entitled to a fair and impartial hearing under these common law concepts of due process and fair play, which include the right to have matters decided by an impartial board.[6]

---

[4] *State ex rel. Lomax v. Leik,* 154 Wis. 2d 735, 739–40, 454 N.W.2d 18 (Ct. App. 1989) (citing *State v. Goulette,* 65 Wis. 2d 207, 215, 222 N.W.2d 622 (1974)). See also *Snyder v. Waukesha County Zoning Board of Adjustment,* 74 Wis. 2d 468, 475, 247 N.W.2d 98 (1976).

[5] *State v. Goulette,* 65 Wis. 2d 207, 215, 222 N.W.2d 622 (1974) (quoting *State ex rel. Ball v. McPhee,* 6 Wis. 2d 190, 199, 94 N.W.2d 711 (1959)).

In this case no statute or ordinance governs disqualification of a board member. The court has recognized a common law duty of disqualification. *Kachian v. Optometry Examining Board,* 44 Wis. 2d 1, 13, 170 N.W.2d 743 (1969); *Guthrie v. WERC,* 111 Wis. 2d 447, 457–58 331 N.W.2d 331 (1983).

[6] Although the parties characterize the Board's hearing as adjudicative, we need not label these proceedings quasi-legislative or quasi-judicial to determine whether the decision-maker must be impartial. We need look only to the characteristics of the proceedings to determine whether the decision-maker must be impartial. In this case the Board must make factual determinations about an individual property owner and then apply

The parties further agree that due process and fair play can be violated "when there is bias or unfairness in fact[, or when] . . . the risk of bias is impermissibly high."[7] The parties disagree whether Marris received a fair and impartial hearing.

In determining whether Marris was afforded due process and fair play, we recognize that zoning decisions implicate important private and public interests; they significantly affect individual property ownership rights as well as community interests in the use and enjoyment of land. Furthermore, zoning decisions are especially vulnerable to problems of bias and conflicts of interest because of the localized nature of the decisions, the fact that members of zoning boards are drawn from the immediate geographical area, and the adjudicative, legislative and political nature of the zoning process.[8] Since biases may distort judgment, impartial decision-makers are needed to ensure both

those facts to the ordinance. We conclude that common law notions of fairness require an impartial decision-maker under these circumstances.

[7] *Guthrie v. Wisconsin Employment Relations Commn,* 111 Wis. 2d 447, 454, 331 N.W.2d 331 (1983). Both parties rely on *Guthrie* which involved a state, not a local governmental, agency. The case recognizes common law as well as constitutional concepts of due process and fair play. It adopted and applied the rule (originating in the common law and sec. 757.19 (2)(c) which applies only to judges) that when an attorney represents a party in earlier proceedings due process requires that the attorney may not act as a decision-maker in the same case. Although *Guthrie* speaks of both common law and constitutional due process, the parties have not analyzed this case in terms of federal or state constitutional due process.

[8] Mark Cordes, *Policing Bias and Conflicts of Interest in Zoning Decisionmaking,* 65 N.D.L. Rev. 161, 161–62 (1989).

sound fact-finding and rational decision-making as well as to ensure public confidence in the decision-making process.[9]

Nevertheless, a board member's opinions on land use and preferences regarding land development should not necessarily disqualify the member from hearing a zoning matter. Since they are purposefully selected from the local area and reflect community values and preferences regarding land use,[10] zoning board members will be familiar with local conditions and the people of the community and can be expected to have opinions about local zoning issues.

The zoning decision in this case requires that the Board examine a specific piece of land and the activities of a particular property owner. It must engage in fact-finding and then make a decision based on the application of those facts to the ordinance. In this case, where established criteria direct the Board's fact-finding and decision-making, Marris should expect that a decision will be made on the basis of the facts and the law. If a Board member prejudges the facts or the application of the law, then Marris's right to an impartial decision-maker is violated.

Determining whether a board member has prejudged a matter requires an examination of the facts of the individual case. In this case we look to the statements made by chairperson Kuerschner. A clear statement "suggesting that a decision has already been reached, or prejudged, should suffice to invalidate a decision."[11]

---

[9] *Id.* at 162–63.
[10] *Id.* at 208.
[11] *Id.* at 208.

Marris asserts that the chairperson of the Board prejudged her case before the December 5 public hearing and before the Board reached a final decision. Accordingly, she contends that she did not have a fair and impartial hearing. To support her position Marris points to three comments made by the chairperson.[12] First, the chairperson referred to Marris's legal position as a "loophole" in need of "closing." Marris claims that this reference indicates the chairperson's intention to terminate her legal nonconforming use status rather than to apply the ordinance objectively and impartially to the facts of her case. Second, the chairperson suggested to Board members and the assistant city attorney that they should try to "get her [Marris] on the Leona Helmsley rule." Marris argues

---

[12] The comments to which Marris objects were set forth by Marris's counsel in a letter to the chairperson dated November 17, 1989, requesting that the chairperson recuse himself. The letter is part of the record.

The chairperson's full comments are preserved on a tape recording of the October 3, 1989, meeting of the Board. Marris requested that the Ozaukee County circuit court supplement the record with this tape. The Board objected to supplementing the record. The Ozaukee County circuit court entered its decision affirming the decision of the Board without ruling on the motion. The circuit court did not address the issue of bias. The tape recording was included in the record on appeal to the court of appeals as certified by the circuit court even though apparently it was not part of the certiorari record in the circuit court. According to the files in this court both parties argued the merits of the issue of bias before the court of appeals.

Prior to oral argument the Board moved this court to strike references in Marris's brief to direct quotations taken from the tape recording of the Board's meeting because the tape recording was not properly before the circuit court. This court denied the Board's motion.

27

that this suggestion illustrates the chairperson's personal bias against Marris and her claim. Third, the chairperson questioned how the Board, in analyzing expenditures, could know whether Marris "bought a door for that building or for another building she built." Marris asserts that this question indicates that the chairperson had prejudged her credibility. Marris asserts that because the totality of the comments indicate prejudgment, the chairperson's refusal to recuse himself denied her a fair hearing.

The Board explains that the chairperson's comments, when taken in context, do not demonstrate prejudgment of the matter. While the Board acknowledges that "loopholes" was an "unfortunate" word choice, it claims that the chairperson was referring to questions about the zoning ordinance and was merely attempting to clarify the findings required by the circuit court.[13] The Board asserts that, regardless of the "loopholes" comment, it engaged in objective fact-finding. In support of its contention, the Board's brief points out that, as a result of the October 3, 1989, discussion, it hired experts to determine when Marris made the improvements and their cost. According to the Board, it needed this information to comply with the ordinance and the circuit court's directive.

The Board explains the chairperson's statement about "get[ting Marris] on the Leona Helmsley rule" by stating that Helmsley's extensive remodeling expenditures were in the news at the same time that the Board was grappling with Marris's remodeling expenditures. The Board's brief argues that these references to Leona

---

[13] The circuit court ordered the Board to determine the assessed value of the property at the last structural repair or alteration and the cumulative total of that proposed alteration and all previous like repairs or alterations.

Helmsley, while they may seem inappropriate, cannot be understood when taken out of this context three years after the fact. The brief asserts that these references do not mention Helmsley's legal problems, do not compare Marris with a convicted felon, and do not show actual bias.[14]

Finally, the Board argues that the chairperson's question about the documentation of Marris's renovation expenses was proper, since Marris's records concerning the expenses were incomplete at the time the comment was made.

We recognize that it may be difficult, several years after the fact, to differentiate a predisposition from an ill-advised choice of words and from a statement showing prejudgment. Nevertheless we conclude that the chairperson's comments about Marris created a situation in which the risk of bias was impermissibly high.

We consider Kuerschner's reference to Marris's legal position as a "loophole" in need of "closing" more than an "unfortunate choice of words" when viewed in the context of the Leona Helmsley comment. Taken together, these statements overcome the presumption

---

[14] In September, 1989, New York real estate billionaire Leona Helmsley was convicted of 33 counts of tax evasion. Helmsley, the self-proclaimed queen of the Helmsley Palace hotel, had been charged with evading personal income taxes by disguising as business expenses some $4 million in renovation costs at her estate in Greenwich, Connecticut. Typical of the items reported about Helmsley in news magazines was the following: "As testimony revealed, she was as ferocious with her employees as a bulldog, albeit one with a facelift, summoning workmen with, Hey, you with the dirty fingernails! and icily firing a vice president at Christmas time while being fitted by her dressmaker." Margaret Clarson, *Revenge of the Little People,* Time, Sept. 11, 1989, at 27.

of honesty and integrity that would ordinarily be applied to this case. *Guthrie v. WERC*, 111 Wis. 2d 447, 455, 331 N.W.2d 331 (1983); *State ex rel. Northwestern Dev. Corp. v. Gehrz*, 230 Wis. 412, 421–22, 283 N.W. 827 (1939).

While it is true that Leona Helmsley's remodeling expenditures were in the news during the time the Board decided Marris's case, that fact alone does not explain why the chairperson would suggest to Board members and the assistant city attorney that they "get her [Marris] under the Leona Helmsley rule." The phrase "get her" indicates prejudgment and a desire to prosecute. Impartial decision-makers do not "get" the parties before them. Rather, they objectively apply the law to the facts of each case. The chairperson's use of this phrase created an impermissibly high risk of bias because the statement indicates the chairperson's opinion that Marris's legal position was without merit and was in fact deserving of punishment.

While it is impossible to determine exactly what the chairperson meant, it seems clear that "the Leona Helmsley rule" is not synonymous with the zoning ordinance the Board was required to apply to the facts of Marris's case. Furthermore, by making this statement, the chairperson implicitly compared Marris to Leona Helmsley. Since Helmsley was convicted of tax evasion, this statement indicates that the chairperson's intent was to rule against Marris at the December 5, 1989, hearing. The comment created an impermissibly high risk of bias.

■

We do not believe that the chairperson's question regarding the documentation of Marris's renovation expenditures is indicative of prejudgment or creates a situation where the risk of bias is impermissibly high.

This comment could well have been made within the context of a proper factual inquiry. However, some of the chairperson's comments clearly indicated that he had prejudged Marris's case, thus creating an impermissibly high risk of bias. Therefore we conclude that the chairperson erred when he refused to recuse himself from the December 5, 1989, hearing and that he deprived Marris of her right to common law due process. Accordingly, the Board's decision must be vacated and the matter remanded to the Board for a new hearing, without chairperson Kuerschner's participation.

## III.

The second issue before us is a determination of what improvements[15] to Marris's property constitute structural repairs or alterations under the Cedarburg zoning ordinance. Identifying the structural repairs or alterations is important because the ordinance provides that to retain legal nonconforming use status the "total lifetime structural repairs or alterations" to a property "shall not exceed 50% of the current assessed value." Cedarburg Zoning Code sec. 16.0901.[16] While it permits improvements to nonconforming use struc-

---

[15] The disputed items include pouring concrete over an existing dirt floor, the replacement of a staircase and loose boards on the second floor, the installation of bathroom fixtures and the installation of electricity and additional lighting.

[16] *EXISTING NONCONFORMING USES.* The lawful nonconforming use of a structure, land or water existing at the time of the adoption or amendment of this Ordinance may be continued although the use does not conform with the provision of this Ordinance, subject to the following conditions:

. . . .

Total lifetime structural repairs or alterations shall not exceed 50 percent of the current assessed value of the structure

tures, the Cedarburg zoning ordinance imposes restrictions on the dollar amount of structural repairs or alterations.

The parties agree that the word "structural" modifies the word "alterations" as well as the word "repairs" and that the ordinance defines the phrase "structural alterations." They accept the definition of "structural alterations" as set forth in the ordinance and do not debate the meaning of this phrase.[17] The parties' disagreement centers on the proper meaning of the phrase "structural repairs," which is not defined in the ordinance.

In the interpretation of ordinances, the rules of statutory interpretation apply. *County of Columbia v. Bylewski,* 94 Wis. 2d 153, 169 n.7, 288 N.W.2d 129 (1980). The meaning of words in an ordinance presents a question of law, and the "blackletter" rule is that a court decides the meaning of an ordinance independently of a board's or other courts' interpretations.

unless the use thereafter conforms to the provisions of this Ordinance . . . .

Section 62.23(7)(h), Stats. 1990–91, provides: "(h) *Nonconforming uses.* The lawful use of a building or premises existing at the time of the adoption or amendment of a zoning ordinance may be continued although such use does not conform with the provisions of an ordinance. Such nonconforming use may not be extended. The total structural repairs or alterations in such a nonconforming building shall not during its life exceed 50 per cent of the assessed value of the building unless permanently changed to a conforming use . . . ."

[17] Section 16.1402 *SPECIFIC WORDS AND PHRASES.*
. . . .

*Structural Alteration*

Any change in the supporting members of a structure, such as foundations, bearing walls, columns, beams, or girders.

32

Courts, however, give varying degrees of deference to agency interpretations of a law and frequently refrain from substituting their interpretation for that of the agency charged with administration of the law. *West Bend Educ. Assn v. WERC,* 121 Wis. 2d 1, 11–12, 357 N.W.2d 534 (1984). The Board argues that it has had extensive experience interpreting the ordinance and that its interpretation therefore is entitled to great weight and should not be upset if a rational basis for the interpretation exists. While we concede that the Board has expertise, we are concerned that any discussion of the phrase "structural repairs" in the Cedarburg ordinance may have significance beyond interpreting the Cedarburg ordinance. The ordinance in question is substantially similar to a state statute and to ordinances across the state, although the language of the state statute and the various ordinances may vary. Under these circumstances, we conclude that one board's interpretation of the language in a single case should not be viewed as controlling or persuasive and that we should interpret the term "structural repairs" *de novo.* Furthermore, as our discussion makes clear, we do not think the Board's interpretation of the Cedarburg ordinance is reasonable.

In determining the meaning of the Cedarburg ordinance it is helpful to understand its objective. Ordinances governing the improvement of a structure that has legal nonconforming use status are intended to balance two competing policies: protection of property ownership rights and protection of the community's interest in the speedy elimination of nonconforming uses. *State ex rel. Covenant Harbor Bible Camp v. Steinke,* 7 Wis. 2d 275, 283, 96 N.W.2d 356 (1956). These ordinances avoid imposing undue hard-

ship on property owners by allowing them to continue the nonconforming use of the property and to make reasonable renovations to prevent deterioration. However, to ensure that the life of the structure is not extended indefinitely and that the nonconforming use is gradually eliminated, these ordinances also limit the amount of structural repairs or alterations property owners can make. The underlying policy goal is to "encourage at least some improvement and modernization of nonconforming buildings at the expense of extending the life expectancy of nonconforming uses." *Waukesha County v. Seitz,* 140 Wis. 2d 111, 120–21, 409 N.W.2d 403 (1987) (quoting 1 R. Anderson, American Law of Zoning 3d sec. 6.56, at 617 (1986)). Thus, an interpretation and application of the ordinance must accomplish the objective of the ordinance by balancing the competing interests in a reasonable way.

Marris asserts that the phrase "structural repairs or alterations" simply means "structural alterations" as that phrase is defined in the ordinance. Thus, according to Marris, structural repairs or alterations means changes of supporting members of a structure such as foundations, bearing walls, columns, beams or girders. The import of Marris's argument is that the word "repairs" in the ordinance is superfluous.

Marris's interpretation of the ordinance does not persuade us to declare words of the ordinance superfluous. We do not believe her interpretation strikes the proper balance between the rights of the property owner and the community. By allowing the property owner to extend the life of the nonconforming use by making drastic changes in the building, Marris's interpretation favors the property owner's interest over that of the community.

The Board argues that the phrase "structural repairs" is not mere surplusage. It urges, and the circuit court and court of appeals agree, that the phrase "structural repairs" means each and every improvement to a legal nonconforming use that is not considered ordinary maintenance.

The Board bases its interpretation of "structural repairs" on the last sentence of the ordinance's definition of the phrase "substantial improvement." The ordinance defines "substantial improvement" as any repair, reconstruction or improvement of a structure, the cost of which equals or exceeds 50% of the present equalized assessed value of the structure. Section 16.1402.[18] The ordinance then goes on to say that "[o]rdinary maintenance repairs are not considered structural repairs, modifications or additions; such ordinary maintenance repairs include internal and external painting, decorating, paneling, and the replacement of doors, windows, and other structural components." The Board argues that the provision in the ordinance that "ordinary maintenance repairs are not considered structural repairs" implies that struc-

---

[18] 16.1402 *SPECIFIC WORDS AND PHRASES*.

. . . .

*Substantial Improvement*

Any repair, reconstruction or improvement of a structure, the cost of which, equals or exceeds 50 percent of the present equalized assessed value of the structure either before the improvement or repair is started or if the structure has been damaged, and is being restored, before the damage occurred . . .

. . .. Ordinary maintenance repairs are not considered structural repairs, modifications or additions; such ordinary maintenance repairs include internal and external painting, decorating, paneling and the replacement of doors, windows, and other structural components.

tural repairs include any improvements that are not considered ordinary maintenance. The Board's brief seems to urge that the court interpret the ordinance's list of ordinary maintenance repairs as all-inclusive.[19]

The Board asserts that its interpretation is consistent with the ordinance's purpose: the definition of ordinary maintenance repairs is broad enough to allow the property owner to preserve the building's integrity, thereby protecting property rights, and yet limited enough to ensure that the nonconforming use of the structure is not extended beyond a reasonable time. We do not agree with the Board. We conclude that its interpretation favors the community's interest over that of the property owner.

While the ordinance does state that ordinary maintenance repairs are not structural repairs, it does not state, as the Board contends, that all improvements except ordinary maintenance repairs constitute structural repairs. Some improvements, such as the installation of additional lighting, fall outside the Board's definition of ordinary maintenance, yet they

---

[19] The definition of structural repairs that the Board urges is very broad. For example, in the videotape of the premises, the city building inspector repeatedly described work, such as electrical wiring, plumbing, and lighting, as penetrating structural walls or beams, intimating that any such penetration constituted a structural repair. Also, a contractor testified that any repair not set forth as ordinary maintenance in the ordinance is a structural repair. He testified that the following are "structural repairs" because they become part of the structure: (1) pouring a concrete floor in place of a gravel floor; (2) adding a bathroom or toilet; (3) adding a partition; (4) adding a shower door on the shower; (5) adding electrical wiring; and (6) placing a sink in the basement. The Board relied on this testimony in its briefs to support its conclusions.

appear unlikely to prolong the life of the nonconform-
ing use structure.

Our task is to distinguish between structural
repairs, which fall within the 50% limitation of the
ordinance, and non-structural repairs which do not. It
is not an easy task. Throughout the country, laws simi-
lar to the Cedarburg ordinance have generated
litigation over the types of improvements that are lim-
ited by law. Indeed one of the most complex problems
besetting municipalities, according to at least one com-
mentator, is how to handle nonconforming uses of
property. 4 E.C. Yokley, Zoning Law and Practice sec.
22–1, p. 1 (1979).

The cases grappling with statutory terms such as
"structural alteration" or "structural repairs" do not
provide a clear or consistent definition.[20] Each case
turns on the precise language of the applicable law and
the particular facts before the court. Courts interpret-
ing these provisions have generally concluded that no
one rule can be established or applied and that each
case must be judged on its own unique facts.

We cannot set forth a hard and fast definition
which easily distinguishes between structural and
non-structural repairs. Any discussion of the meaning
of the phrase "structural repairs" must be in terms of
the purpose of this type of ordinance, the language of

---

[20] For discussions of the issue and cases, *see e.g.,* 1 Robert
M. Anderson, American Law of Zoning 3d sec. 6.02, 6.04, 6.07,
6.45, 6.46, 6.47, 6.56, 6.57 (1986); 8A McQuillin, The Law of
Municipal Corporations, secs. 25.183, 25.184, 25.210–25.212a
(3d ed. 1986 rev. ed.); 4 E.C. Yokley, Zoning Law and Practice
sec. 22–10 (1979); Annot., Alteration, Extension, Reconstruc-
tion, or Repair of Nonconforming Structure or Structure
Devoted to Nonconforming Use as Violation of Zoning Ordi-
nance, 63 A.L.R.4th 275 (1988).

the ordinance, and the proposed improvement. Nonetheless, some general guidelines can be set forth. These guidelines must be applied by zoning boards with common sense and consideration of all the circumstances.

We construe structural repairs in this ordinance to include work that would convert an existing building into a new or substantially different building, or work that would affect the structural quality of the building. We also construe structural repairs in this ordinance to include proposed improvements that would contribute to the longevity or permanence of the building. This characterization of structural repairs satisfies the public interest in eliminating nonconforming uses. If work indefinitely prolonging the natural life of nonconforming buildings were permitted, the purpose of zoning to achieve uniformity would be defeated.

However, under our characterization of structural repairs an owner is permitted to modernize facilities. The right to continue a use existing at the time a zoning restriction becomes effective necessarily embraces preservation of that use. Therefore proposed improvements such as the addition of acoustical ceilings or the installation of heating, electricity, plumbing (including fixtures) or insulation, might not ordinarily be regarded as structural repairs. Such improvements might be characterized as remodelling, or as improving the appearance or efficiency of a nonconforming use structure. Likewise, repairs that are reasonably necessary to prevent deterioration might not be classed as ✓structural repairs. It is in the community's interest that buildings be maintained in good, safe and sanitary condition. We recognize that any modernization or maintenance carries with it some possibility of extending the life expectancy of the nonconforming

use. Yet, in order to respect ownership rights, some
modernization and maintenance must be permitted.

We have attempted to provide a functional defini-
tion to guide the Board in the exercise of its
discretionary decision-making. The Board must use its
discretion in applying this functional definition of
structural repairs in a fair and reasonable manner in
each case, considering the language of the ordinance,
the purposes of the ordinance and the need to balance
individual and community interests.

For the reasons set forth, we reverse the decision of
the court of appeals and remand the matter to the
circuit court for remand to the Board of Zoning Appeals
for the City of Cedarburg for further proceedings con-
sistent with this opinion.

*By the Court.*—The decision of the court of appeals
is reversed and the cause remanded to the circuit court.