Lyn and Stephen Sills, Steve and Michelle Glasgow, John and Janet Harding, Hayden and Helene Leason, William and Sheila Groden, Brian and Marilyn Grant, Donald and Denise Sheldon, George and Susan Gootsan, Arthur and Mary Ann Langas, Karen and Richard Eagan, Martha and Andrew Belknap, Margaret Newell, Fred Knutsen, Karen Dulla Sitkowski, Donna and Michael Mulvihill, Kathleen and James Berberet, Susan and James Hickox, Monica and Robert Johnson, Deborah and William Eagan, Scott Aubin, Jean and Bill Moritz, Timothy J. Eagan, Allison and James Breidenbach, Lynn and F. Owen McKeaney, Margy and Ron Walkington, Mary Lynn and Peter McCafferty, Eileen Hennessy, Mary and Roger Donahue, Liz and George Relos, Nancy and Edward Powers, James M. Langelund, Peter H. Edward, James J. Skarda, Trustee of Cindy and James J. Skarda Trust and William Grunow, Sr., Plaintiffs-Appellants,†

v.

Walworth County Land Management Committee, William O. Petersen, Conrad W. Petersen, and Edward S. Petersen as Trustee under the Edward S. Petersen Trust Dated April 29, 1977, Defendants-Respondents.

† Petition to review denied 6-11-02.

538

Court of Appeals

*No. 01–0901. Submitted on briefs February 7, 2002.—Decided
April 3, 2002.*

## 2002 WI App 111

(Also reported in 648 N.W.2d 878.)

540

542

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Lisle W. Blackbourn* of *Godfrey, Leibsle, Conover, Blackbourn & Howarth, S.C.* of Elkhorn and *Timothy P. Swatek* of *Allen, Harrison, Williams, McDonell & Swatek, LLP.* of Lake Geneva.

On behalf of the defendants-respondents, the cause was submitted on the brief of *William P. O'Connor* and *Mary Beth Peranteau* of *Weeler, Van Sickle & Anderson, S.C.* of Madison and *Michael P. Cotter, Walworth County Corporation Counsel.*

Before Nettesheim, P.J., Brown and Anderson, JJ.

¶ 1. BROWN, J. A group of neighborhood citi-

zens appeals from a circuit court certiorari review upholding the grant of a conditional use permit (CUP) for the creation and operation of a public museum at Black Point Estate, a historic residence located on Geneva Lake. The neighbors contend that the Walworth County Land Management Committee erred as a matter of law by failing to consider the potential application of restrictive covenants limiting the use of the Black Point property as "first class residence property." This is an issue of first impression in Wisconsin. We share the view of other jurisdictions, however, that private contracts restricting the use of land are not grounds for denial of a CUP. While the Committee may, in its discretion, consider the potential application of private agreements, it is not under an obligation to do so.

¶ 2. The neighbors also contend that the Committee's decision was legally flawed because preservation or historic benefit is not a valid criterion for evaluating a CUP application. We conclude that promotion of the general welfare, one of the stated purposes of the Walworth County Shoreland Zoning Ordinance, encompasses the preservation of historical sites. Therefore, preservation is a valid criterion the Committee may use in evaluating a CUP application.

¶ 3. Finally, the neighbors argue that they should have been allowed to conduct additional discovery to supplement the certiorari record for the purpose of uncovering bias in the proceedings. We hold that when an applicant makes a prima facie showing of bias in a zoning case, certiorari law allows expansion of the record in order to protect the applicant's right to procedural due process. In this instance, however, the neighbors have failed to make a prima facie showing of bias to justify additional discovery.

**Facts**

¶ 4. The Black Point Estate is a well-preserved, thirteen-bedroom Queen Anne-style residence built in 1888, housing a valuable collection of period furnishings and art. The property was constructed as a family summer home by the great-grandfather of the current owner, William Petersen. The residence is listed on the National Register of Historic Places and the Wisconsin State Register. Described in testimony as a "time capsule," the residence today is in virtually the same condition as it was in the 19ᵗʰ century.

¶ 5. The Petersen family's plan to preserve the estate led to a proposal under which the State of Wisconsin would own Black Point, and a local nonprofit organization, Black Point Historic Preserve, Inc., would manage the site.[1] To implement the plan, Petersen, the State of Wisconsin and the Black Point Historic Preserve, Inc., submitted an application for a CUP to the Committee. The Committee held two days of public hearings to consider the application. The record of the Committee's proceedings consists of nearly 2000 pages of reports, transcripts, letters and other correspondence. Much of the testimony concerned traffic safety, property values and conservation issues. The Committee approved the CUP application on May 23, 2000, subject to several conditions.

---

[1] In 1997, legislation was enacted providing for the department of administration to accept the Petersens' gift of Black Point Estate. That legislation also appropriated $1.8 million as an endowment fund for management of the property and $1.6 million for a building fund. *See* Wis. Stat. §§ 23.0962, 20.866(2)(wr) (1997–98). All other references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

## Standard of Review

¶ 6. The decision of the Committee is entitled to a presumption of correctness and validity. *Kapischke v. County of Walworth*, 226 Wis. 2d 320, 328, 595 N.W.2d 42 (Ct. App. 1999). Therefore, our review of the Committee's action is limited to: (1) whether the Committee kept within its jurisdiction; (2) whether it acted according to law; (3) whether its action was arbitrary, oppressive or unreasonable and represented its will and not its judgment; and (4) whether the evidence was such that it might reasonably make the determination in question. *Id.* at 327–28.

¶ 7. The neighbors do not challenge the jurisdiction of the Committee to grant the CUP under the Walworth County Shoreland Zoning Ordinance. Nor would such a challenge have any merit. A CUP allows a property owner to put property to a use that the zoning ordinance authorizes when certain conditions have been met. *State ex rel. Skelly Oil Co. v. Common Council*, 58 Wis. 2d 695, 701, 207 N.W.2d 585 (1973). The authorized conditional uses where Black Point Estate is located include "[g]overnmental and cultural uses, such as fire and police stations, community centers, libraries, public emergency shelters, parks, playgrounds, museums, and park-N-ride facilities." *See* WALWORTH COUNTY, WIS., SHORELAND ZONING ORDINANCE (ORDINANCE) §§ 3.4, 3.6 (2000). The neighbors themselves refer to the proposed use of Black Point Estate as a public museum. As an initial matter, therefore, the Committee had jurisdiction to consider the CUP appli-

cation because it described a use approved in the ordinance as a conditional use in the affected zoning districts.

¶ 8. Nor do the neighbors assert that the Committee's decision was arbitrary or represented its will and not its judgment. Thus, the neighbors challenge the Committee's decision under the certiorari standards as to whether the decision was supported by substantial evidence and whether the Committee acted according to law. The other legal error asserted by the neighbors relates to the circuit court's discovery ruling on certiorari review. We discuss each of these issues below.

## Sufficiency of the Evidence

¶ 9. The Walworth County Shoreland Zoning Ordinance sets forth the criteria the Committee must use to evaluate an authorized conditional use. These criteria involve three general areas of concern: the purpose and intent of the ordinance, environmental impacts (including water quality and shoreland cover) and property values. ORDINANCE § 4.2. The ordinance's stated purpose is to promote the comfort, health, safety, prosperity, aesthetics and general welfare of Walworth county and its communities. *Id.* at § 1.3.[2]

¶ 10. The neighbors allege that the Committee failed to properly apply these criteria because the ordinance's stated purpose of promoting the general

---

[2] The general intent of the ordinance is to, inter alia, regulate the use of land and conserve natural resources, stabilize and protect the natural beauty and property values of the county, lessen congestion, preserve natural growth and cover and facilitate the adequate provision of public facilities. ORDINANCE § 1.4.

welfare is not furthered by historic preservation, particularly when that use is incompatible with other uses in the district. Additionally, they contend that the Committee ignored traffic, safety and property value concerns raised during the hearings. These arguments challenge the sufficiency of the evidence underlying the Committee's decision. This invokes the substantial evidence test—a significant hurdle for the neighbors to overcome.

¶ 11. We must uphold the Committee's decision so long as it is supported by substantial evidence, even if there is also substantial evidence to support the opposite conclusion. *CBS, Inc. v. LIRC*, 219 Wis. 2d 564, 568 n.4, 579 N.W.2d 668 (1998). Substantial evidence means credible, relevant and probative evidence upon which reasonable persons could rely to reach a decision. *Princess House, Inc. v. DILHR*, 111 Wis. 2d 46, 54, 330 N.W.2d 169 (1983). Finally, the weight to be accorded to the evidence lies within the discretion of the Committee. *Delta Biological Res., Inc. v. Bd. of Zoning Appeals*, 160 Wis. 2d 905, 915, 467 N.W.2d 164 (Ct. App. 1991) ("The weight to be accorded the facts is for the board to determine rather than the courts.").

¶ 12. We begin our analysis with the neighbors' contention that the Committee erred by considering the historic benefit of Black Point Estate because the ordinance does not explicitly mention historic preservation in its statements of purpose and intent. Ordinance §§ 1.3, 1.4. Therefore, according to the neighbors, preservation or historic benefit is not a valid criterion for evaluating a CUP application. However, the appropriateness of the Committee considering the preservation

of Black Point as a historical site and as a museum is strongly supported by the ordinance, case law and statutes.

¶ 13. ORDINANCE § 1.3 includes the promotion of aesthetics and the general welfare of Walworth County as its stated purpose. A review of the statutes and case law reveals that the phrase "general welfare" has a broad meaning encompassing a wide range of areas. In *State ex rel. State Historical Society v. Carroll*, 261 Wis. 6, 22, 51 N.W.2d 723 (1952), the court approved a city accepting a deed to property to be used exclusively as a museum with a further conveyance to a historical society to operate the site as a museum. We note the following comments of the court:

> The reasonable use of public money for memorial halls, monuments, statues . . . parks, roads leading to points of fine natural scenery, decorations upon public buildings, and other public ornaments or embellishments, designed merely to promote the general welfare, by providing for fresh air or recreation, by educating the public taste, or by inspiring sentiments of patriotism or of respect for the memory of worthy individuals, has received such general sanction that there can be no doubt that municipal corporations may be constitutionally authorized to expend money raised by taxation for such purposes.

*Id.* at 20 (citation omitted).

¶ 14. From the above, we are persuaded that the general welfare is promoted by the preservation of historical sites and maintenance of museums to educate the public and to inspire patriotism and respect for our history. Since this is an aspect of general welfare, the ordinance recognizes preservation or historic benefit as a valid criterion for evaluating a CUP application.

¶ 15. We find further support for this conclusion in Wisconsin statutes that specifically encourage county zoning authorities to consider sites of historic preservation in their zoning decisions. For example, WIS. STAT. § 59.69(4m) expressly authorizes counties to regulate historic places "for the purpose of promoting the health, safety and general welfare of the community." To accomplish this purpose, a zoning authority may by ordinance establish and regulate "[p]laces, structures or objects with a special character, historic interest, aesthetic interest or other significant value, historic landmarks and historic districts." WIS. STAT. § 59.69(4)(L).

¶ 16. Finally, WIS. STAT. § 44.30 establishes the legislative intent that historic preservation is a public policy of the state:

> The legislature finds that the historic, architectural, archaeological and cultural heritage of the state is among the most important assets of the state and furthermore that the social, economic and physical development of contemporary society threatens to destroy the remaining vestiges of this heritage. It is therefore declared to be the public policy and in the public interest of this state to engage in a comprehensive program of historic preservation to promote the use and conservation of such property representative of both the rural and urban heritage of the state for education, inspiration, pleasure and enrichment of the citizens of this state.

¶ 17. The foregoing language evinces the legislature's intent to include historic preservation as an aspect of the general welfare. Nevertheless, the neighbors respond that the record contains unrefuted testimony that the use of Black Point Estate as a public museum would be "unsuitable" and "incompatible with surrounding uses." We agree with the Committee, how-

551

ever, that whether the proposed use is compatible with existing use is not relevant to the standards listed in ORDINANCE § 4.2 (requiring Committee to consider three general criteria: purpose and intent of the ordinance, environmental impacts and property values). Moreover, the neighbors' position is contrary to the fundamental tenet that inclusion of a conditional use in an ordinance is equivalent to a legislative finding that the prescribed use is one that is in harmony with the other uses permitted in the district. In other words, the neighbors' contention that the proposed use is incompatible contradicts the County Board of Supervisors' legislative determination, embodied in the zoning ordinance, that museums and similar public uses are compatible with the permitted uses in the districts where Black Point Estate is located. 3 KENNETH H. YOUNG, ANDERSON'S AMERICAN LAW OF ZONING § 20.03, at 416 n.30 (4th ed. 1996 & Supp. 2001).

■

¶ 18. The neighbors also raise specific evidentiary challenges pertaining to traffic and safety, financial feasibility of the proposed use, the self-policing of the property and property values. With respect to traffic and safety, the neighbors presented compelling evidence in a report generated by engineer Gene A. Scharfenorth. In the report, Scharfenorth expressed concern over the ability of the roads to handle increased traffic volume, based on the lack of safe stopping distances and structural inadequacies of the roads. However, as the Committee points out, the record contains a competing analysis by the Walworth County Planning staff that estimated that the amount of traffic increase will be minimal under the circumstances; indeed, no greater than if the area were developed for

single-family housing.[3] Furthermore, the CUP addresses the traffic and safety concerns by placing caps on the number and sizes of tour groups and by limiting the times of operation. The bottom line is that the weight to be accorded all of this evidence was within the discretion of the Committee. *Delta Biological Res.*, 160 Wis. 2d at 915. Under the substantial evidence test, the Committee was entitled to accept the applicants' evidence of traffic impact over the neighbors' evidence.

¶ 19. The neighbors posit three remaining challenges to the sufficiency of the evidence: the project is financially infeasible, the State is not bound by the CUP and may choose to ignore its terms, and the custodians of the estate will be unable to effectively monitor their compliance with the CUP requirements. The net effect of all these factors, according to the neighbors, will be diminished property values. As with the traffic and safety issue, however, the Committee had substantial evidence to counter these concerns. With regard to the financial feasibility of the project, for example, the Committee considered several feasibility studies; some of them supported the economic soundness of the project and some did not. Again, the record is clear that the Committee heard the competing evidence, weighed it and concluded that the project was economically

---

[3] The CUP limits the number of tours to eight per day, with a maximum length of ninety minutes. According to the Committee, this means the traffic would consist of one shuttle bus entering or leaving the shuttle transfer point approximately every ninety minutes. Scharfenorth's report contradicted this estimate, asserting that it fails to include the additional trips to Black Point Estate attributable to employees, repairmen, service vendors and "curious on-lookers."

feasible. Because there is substantial evidence to support the Committee's conclusion, we cannot overturn its decision.

■

¶ 20. The neighbors contend that there is no assurance that the conditions governing the CUP will be enforced once the State takes ownership of the property since the State is not bound by local zoning. *See Green County v. City of Monroe*, 3 Wis. 2d 196, 198, 87 N.W.2d 827 (1958). The Committee cites Wis. Stat. § 13.48(13) as a statutory exception to the common law rule that the State is not subject to local zoning. Relying on an attorney general's opinion, the neighbors respond that the statute applies only to property directly used by the State, such as office buildings, and not property held by the State for recreational purposes for the general public. *See* 81 Op. Att'y Gen. 9–93 at 58 (1993). We do not rule on the correct interpretation of § 13.48(13). Even if the neighbors are correct that the State is not subject to local zoning laws, we view this issue as an evidentiary matter for the Committee in its consideration of whether the evidence suggests that the State would not administer or oversee the property in a responsible manner. Our review of the record reveals no evidence that the State intends to back away from its commitment to the proposed use.[4] The Committee's decision reflects its determination of this evidentiary issue.

---

[4] In fact, the legislature required the owners to place a perpetual conservation easement on the property, pursuant to Wis. Stat. § 700.40 (1997–98), in order to protect the historic residence and regulate the shoreland property. Wis. Stat. § 23.0962(1)(d) (1997–98). This conservation easement, in combination with the funding appropriations, indicates to us the legislature's commitment to the project.

¶ 21. The neighbors' objection that the site custodians would be inadequate to enforce the conditions of the CUP is also without merit. In addition to being speculative at best, this objection fails to acknowledge that enforcement of zoning laws lies with the County, not the employees of Black Point Estate. The CUP condition requiring site staff to monitor visitors merely places an additional level of control over the use of the site.

¶ 22. Finally, the neighbors misrepresent the record in claiming that evidence of detriment to surrounding properties was unrefuted. Indeed, there is abundant evidence to support the contrary position that historic properties have a positive effect on property values.[5] The most compelling evidence of this is the documented sale of an adjacent lakefront residence that, just prior to the Committee's final vote on the CUP application, sold for more than one million dollars over its assessed value.[6]

¶ 23. In sum, these remaining challenges to the sufficiency of the evidence—financial feasibility, the State as sovereign ignoring the CUP conditions, and self-policing—are all doom and gloom possibilities that may or may not occur. In light of the substantial

---

[5] The record includes a memorandum by real estate professor Richard K. Green stating that "historically preserved buildings tend to either enhance or have no impact on surrounding property values." It also includes an article from THE APPRAISAL JOURNAL in which the author concludes that location in a federally certified historic district enhances the sales price of residential homes within the district.

[6] Ironically, the former owner had opposed the CUP application because he felt it would damage property values.

contradictory evidence, the Committee did not err by ultimately rejecting them. *See Molbreak v. Vill. of Shorewood Hills*, 66 Wis. 2d 687, 704, 225 N.W.2d 894 (1975) ("A mere possibility or an assumption on the part of the witness [with regard to potential future zoning change] is not enough and must be rejected as being speculative.").

¶ 24. We conclude that substantial evidence supports the Committee's decision to issue the CUP to Black Point Estate. The ordinance's three general purposes are well served by the CUP which preserves the historic significance of the property and its buildings. The property will be used as an educational facility, and pursuant to the conservation easement, the natural scenic beauty of the estate will be preserved. While there was conflicting evidence on the effect of the proposed use on property values, the Committee was entitled to give more weight to the evidence that shows the use will support or increase property values.

### *Restrictive Covenant*

¶ 25 The neighbors allege that Black Point Estate is subject to a private restrictive covenant that effectively trumps the County's authority to issue the CUP. The restrictive covenant dates back to 1910 and states in relevant part:

> [T]hat no part or portion of the real estate herein before described . . . shall at any time be occupied, sold or used by . . . their heirs, executors, administrators, successors or assigns, for [a list of specified prohibited uses] any other use or purpose inconsistent with the

maintenance and preservation of all and each and every part of said real estate herein before described, as first class residence property.

¶ 26. The Committee determined that it was not allowed as a matter of law to consider the restrictive agreement as part of the review process. The neighbors claim that this determination violated ORDINANCE § 1.5 which provides:

> Except for the provisions of any ordinance enacted under Section 59.69, Wisconsin Statutes, relating to shorelands which are hereby superseded, it is not intended that this Ordinance repeal, abrogate, annul, impair or interfere with any existing easements, covenants, deed restrictions, agreements, ordinances, rules, regulations, or permits previously adopted or issued pursuant to law. However, wherever this Ordinance imposes greater restrictions, the provisions of this Ordinance shall govern.

¶ 27. According to the neighbors, ORDINANCE § 1.5 required the Committee to consider whether its approval of the CUP application effectively repealed, abrogated, annulled, impaired or interfered with the restrictive agreement and its prohibition against the use of Black Point estate for any purpose other than "first class residence property." This argument raises a broader issue of how the existence of private covenants impacts the administration of county zoning ordinances. We have not found a case in Wisconsin that directly addresses this point of law; however, the Committee has presented us with persuasive authorities supporting the principle that restrictive private covenants have no relevance to proceedings under the zoning laws.

¶ 28. We find the following excerpt from a leading zoning treatise to be a compelling statement for the

proposition that private restrictive covenants and public zoning ordinances operate in entirely separate spheres:

> [Z]oning is entirely divorced in concept, creation, enforcement, and administration from restrictions arising out of agreements between private parties who, in the exercise of their constitutional right of freedom of contract, can impose whatever lawful restrictions upon the use of their lands that they deem advantageous or desirable. Zoning restrictions and restrictions imposed by private covenants are independent controls upon the use of land, the one imposed by the municipality for the public welfare, the other private imposed for private benefit.

> Both types of land use restrictions are held by courts to legally operate independently . . . .

> [I]f a property owner is otherwise entitled to a variance or special exemption, it should be granted, notwithstanding private covenants which would prohibit the proposed use.

5 EDWARD H. ZIEGLER, JR., RATHKOPF'S THE LAW OF ZONING AND PLANNING §§ 82:2, 82:3 (2001). The case law supports the proposition stated in the treatise. *See, e.g., Appeal of Michener*, 115 A.2d 367, 370 (Pa. 1955) ("[I]t has been uniformly held that any consideration of building restrictions placed upon the property by private contract has no place in proceedings under the zoning laws for a building permit or a variance.").

¶ 29. Nevertheless, the neighbors contend that ORDINANCE § 1.5 in this case expressly allows for restrictive covenants ("[I]t is not intended that this Ordinance repeal, abrogate, annul, impair or interfere with any existing . . . deed restrictions."). The neighbors misinterpret the meaning of this language. This section of

the ordinance simply assures that the issuance of a CUP does not repeal or impair a land use restriction established by agreement; it does not create an obligation on the part of the Committee to protect existing covenants.

¶ 30. This point is made clear in *Kramer v. Nelson*, 189 Wis. 560, 563, 565, 208 N.W. 252 (1926), a case which contains interesting parallels to the one before us in that a landowner's deed restriction preserved the property as first-class residence property and the zoning ordinance expressly negated any attempt to abrogate covenants or agreements. The landowner constructed a store building in violation of the deed. *Id.* at 562. Local zoning law had designated the street as a business district and the landowners claimed that the ordinance governed instead of the deed restriction. *Id.* at 565. The court rejected this argument since the ordinance by its terms expressed the intent not to annul such restrictions.[7] *Id.* Under *Kramer*, zoning land for business use has no effect on existing restrictions confining the use of land to residential purposes. Similarly, the grant of a CUP for historic preservation has no effect on the deed restriction preserving Black Point estate as first-class residence property. Therefore, the Committee had no obligation to consider the deed restriction when evaluating the CUP application.

¶ 31. This interpretation of ORDINANCE § 1.5 is mandated by the federal and state constitutions that prohibit the impairment of contracts. *Chappy v. LIRC*, 128 Wis. 2d 318, 325, 381 N.W.2d 552 (Ct. App. 1985), *aff'd,* 136 Wis. 2d 172, 401 N.W.2d 568 (1987). Obvi-

---

[7] The ordinance stated that "[i]t is not intended by this chapter to interfere with or abrogate or annul any easements, covenants or other agreements between parties." *Kramer v. Nelson*, 189 Wis. 560, 565, 208 N.W. 252 (1926).

ously, the County could not enact a law, nor could the Committee grant a permit, that impairs a legal contract. Stated differently, ORDINANCE § 1.5 recognizes that private contractual rights and government enforcement of zoning laws coexist; it ensures that the government may implement zoning laws without impinging on private contractual rights between citizens. *Accord, Suess v. Vogelgesang,* 281 N.E.2d 536, 543 (Ind. App. 1972).

▇▇▇▇▇

¶ 32. The rule which we recognize here, that a private restrictive covenant is not grounds for denial of a proposed use, does not mean that parties to the covenant are without a remedy. When the terms of a zoning law conflict with those contained in restrictive covenants, the remedy for the breach is not through the zoning process but rather by an action for breach of covenant. 4 E.C. YOKLEY, ZONING LAW AND PRACTICE § 26–4, at 346–47 (4th ed. 1979 & Supp. 2001); *see Martel v. City of Vancouver Bd. of Adjustment,* 666 P.2d 916, 921 (Wash. App. 1983), *superceded by statute on other grounds* as stated in *Freeburg v. City of Seattle,* 859 P.2d 610, 612 n.4 (Wash. App. 1993), ("Although a private covenant may provide grounds for a separate action to enjoin a proposed usage of land, the general rule is that such a covenant is not grounds for denial of a zoning variance.").[8]

---

[8] In fact, the validity of the restrictive covenant is pending on the remaining claim in the circuit court. We offer no comment on how the resolution of that remaining claim will ultimately affect the ability of Petersen and the State to operate under the conditional use permit.

¶ 33. We also agree with the Committee's position that enforcement of private restrictions via the county's zoning authority would constitute an impermissible delegation of the police power to private entities. In this case, the neighbors in effect are seeking to have the zoning committee apply the ordinance to prohibit an alleged violation of a restrictive covenant entered into by private parties back in 1910. If the Committee refused to grant the permit because of the restrictive agreement, the agreement would then have the force of law. The Committee has no authority to enforce private covenants in this manner; to do so would involve an improper delegation of the municipality's police power to private individuals. *See State ex rel. Sims v. Eckhardt*, 322 S.W.2d 903, 909–10 (Mo. 1959) (discussing examples where ordinances which attempted to enforce private agreements were held to be void). To reiterate, the parties to a private restriction may challenge a use claimed to violate the restriction, even though that use may be permitted under the zoning ordinance, but they cannot ask the Land Management Committee to act as the enforcer.

### Discovery on Certiorari Review

¶ 34. The neighbors contend that the circuit court erred in refusing to allow them to depose Greg DiMiceli, a lobbyist hired by Petersen to garner public support for the CUP application. The neighbors sought to question him regarding ex parte communications he may have had with Committee members which may have led to bias in the proceedings. To support their request, the neighbors produced a promotional brochure for DiMiceli's business that quoted Petersen as saying:

'We had a daunting task of trying to obtain approval for our project on both the state and local level. The opposition was well organized and motivated. Capital Impact Strategies provided planning and were positive in their approach. They understood our project and knew what had to be done. They were vital to our gathering the needed public support.

¶ 35. The circuit court's determination to disallow the requested discovery was based on its conclusion that certiorari review is limited to the record, unless a statute expressly permits enlargement of the record. For that reason, the court believed it lacked jurisdiction to consider evidence outside of the record before the Committee.

¶ 36. The general rule in common law certiorari is that the circuit court does not take evidence on the merits of the case and the scope of review is limited to the record presented to the tribunal whose decision is under review. *Klinger v. Oneida County*, 149 Wis. 2d 838, 846, 440 N.W.2d 348 (1989). Notwithstanding this well-settled tenet, the neighbors contend that two supreme court decisions "implicitly recognize[] that expansion of the record in an action on common law certiorari is permitted in appropriate cases." Both of these cases involved claims of deprivation of procedural due process in local zoning determinations.

¶ 37. In *Marris v. City of Cedarburg*, 176 Wis. 2d 14, 23, 498 N.W.2d 842 (1993), a municipal zoning board determined that an applicant's property had lost its legal nonconforming use status. The applicant claimed a due process violation based on prejudicial remarks made by the chairperson of the local zoning board, creating an impermissibly high risk of bias. *Id.* at 25–28. Those remarks were set forth in a letter from

Marris' attorney to the chairperson in which the attorney requested that the chair recuse himself from deciding the matter. *Id.* at 27 n.12. The letter was part of the certoriari record. *Id.* Additionally, the chairperson's comments were preserved on a tape recording of the meeting of the board. The tape recording was included in the record on appeal to the court of appeals even though it apparently was not part of the certiorari record in the circuit court. *Id.* The board moved to strike all references to the tape recording prior to oral argument before the supreme court; the supreme court denied the motion.

¶ 38. The neighbors correctly point out that *Marris* explicitly recognized the right of a party in a zoning proceeding to fundamental fair play which means the right to have matters decided by an impartial board. *Id.* at 24. In *Marris*, the court concluded that the chairperson's remarks showed an unreasonably high risk of bias and remanded the matter for a new hearing without the chairperson's participation. *Id.* at 31. The neighbors opine that *Marris* is precedent for the proposition that the law permits expansion of the record in a certiorari action.

¶ 39. We disagree with this interpretation of *Marris*. First, the issue of expansion of the record was never taken up in the opinion of the supreme court. The court simply noted in a footnote that it had denied the request to strike quotes of the recording from the opposing party's brief. Second, in our view the tape recording memorialized the proceedings before the agency and, as such, may appropriately be considered part of the record. Indeed, the supreme court's order may well have been premised on that belief.

¶ 40. The neighbors also rely on *Thorp v. Town of Lebanon*, 2000 WI 60, 235 Wis. 2d 610, 612 N.W.2d 59,

for its argument that a circuit court must expand the record where evidence of procedural unfairness exists. In *Thorp*, landowners brought a 42 U.S.C. § 1983 (1994) action claiming a due process violation based on alleged misrepresentations made by the chairperson of the town board. *Thorp*, 2000 WI 60 at ¶¶ 12, 20. The supreme court held that the landowners had failed to exhaust their administrative remedies and further noted that a certiorari review provided adequate post-deprivation remedies. *Id.* at ¶¶ 54–56. Thus, while *Thorp* affirms that certiorari review is an appropriate forum for allegations of unfairness in a zoning proceeding, it says nothing about the scope of review in a certiorari case.

¶ 41. Neither *Marris* nor *Thorp* squarely addresses the type of due process violation claimed in this case in which the alleged deprivation is not evidenced in the record before the Committee. Yet, both cases recognize the fundamental public policy favoring fair and impartial tribunals at the local level. *Marris* stands for the proposition that the lack of an impartial tribunal invokes procedural due process concerns:

> [Z]oning decisions implicate important private and public interests; they significantly affect individual property ownership rights as well as community interests in the use and enjoyment of land. Furthermore, zoning decisions are especially vulnerable to problems of bias and conflicts of interest because of the localized nature of the decisions, the fact that members of zoning boards are drawn from the immediate geographical area, and the adjudicative, legislative and political nature of the zoning process. Since biases may distort judgment, impartial decision-makers are needed to ensure both sound fact-finding and rational decision-making as well as to ensure public confidence in the decision-making process.

*Marris*, 176 Wis. 2d at 25–26 (footnotes omitted). *Thorp* directs that the applicable remedy for deprivation of procedural due process is certiorari review of the decision-making body. *Thorp*, 2000 WI 60 at ¶¶ 54–55.

¶ 42. Thus, although we reject the neighbors' overbroad interpretation of these cases, we agree with the general proposition that they assert, which is that the public policy of promoting confidence in impartial tribunals may justify expansion of the certiorari record where evidence outside of that record demonstrates procedural unfairness. However, before a circuit court may authorize expansion, the party alleging bias must make a prima facie showing of wrongdoing. In *Marris*, for example, the letter documenting the chairperson's prejudicial remarks would, in our view, constitute a prima facie showing of bias. In this case, the neighbors allege that DiMiceli's marketing brochure implies that he may have had ex parte communication with members of the Committee and may have provided them with information, "oral or written, which they may have considered as part of the decision making process." At the very least, the neighbors contend, the brochure "plainly showed that *something* happened outside the official record of the hearings."

¶ 43. We determine as a matter of law that the neighbors have failed to demonstrate a prima facie showing of bias or even an impermissible risk of bias. *See Marris*, 176 Wis. 2d at 25. Petersen's statement contained in the brochure says only that DiMiceli had helped to gather public support for the project. Contrary to the neighbors' vehement assertions, it says nothing indicating that DiMiceli directly contacted Committee members nor does it infer that the members

were influenced by something more than the application of the evidence to the ordinance standards. Indeed, it is clear that the neighbors have no idea if any contact occurred at all: "The sole and limited purpose for the requested discovery is to determine whether the lobbyist . . . contacted any Committee members . . . ." This transparent attempt to use the discovery process as a fishing expedition to uncover evidence of bias is precluded by the presumption of honesty and integrity that we accord to the Committee's decision. *Guthrie v. WERC*, 111 Wis. 2d 447, 455, 331 N.W.2d 331 (1983).

¶ 44. Furthermore, the neighbors cite to no legal authority to support the contention that ex parte communication with Committee members under these circumstances is illegal. Given the localized and political nature of zoning decisions, and the status of Committee members as representatives of the community, it may be natural that such contacts occur.[9] We hold that an

---

[9] The court in *Marris* relied extensively on an article, Mark W. Cordes, *Policing Bias and Conflicts of Interest in Zoning Decisionmaking*, 65 N.D. L. Rev. 161 (1989), to support its conclusion that prejudgment on the part of a committee member deprived the landowner of procedural due process, invalidating the decision. *Marris v. City of Cedarburg*, 176 Wis. 2d 14, 25–26, 498 N.W.2d 842 (1993). As the Committee points out, that article recognizes that ex parte communications are not a per se violation of due process in the context of zoning permit proceedings:

> [I]t would seem that some ex parte communication is a natural and even necessary part of zoning decision making . . . . To the extent that such decisions will often reflect policy concerns as well as factual determinations, it is natural that contacts occur.

> Similar concerns [regarding ex parte communications], though to a lesser degree, arguably also exist with respect to variance and

allegation of ex parte contacts without more is not sufficient to show the impermissibly high risk of bias that concerned the court in *Marris*. Thus, even if the neighbors had actual evidence of ex parte communications, they would still fail to make a prima facie showing of a procedural due process violation in the absence of bias or an impermissibly high risk of bias. *See Union State Bank v. Galecki*, 142 Wis. 2d 118, 126–27, 417 N.W.2d 60 (Ct. App. 1987) ("Even if there was evidence of an ex parte communication, it would constitute material error only if Union was 'prejudiced by an inability to rebut the facts communicated and if improper influence on the decision maker appears with reasonable certainty to have resulted.' ") (citation omitted).

¶ 45. To summarize, we conclude that the decision of the Committee in granting the CUP to Black Point Estate was based on substantial evidence. The Committee was not required to consider the applicability of the restrictive covenant in evaluating the CUP application. Finally, the neighbors failed to make a prima facie showing of an impermissibly high risk of bias to justify allowing additional discovery to supplement the certiorari record. We therefore affirm the circuit court's order and sustain the Committee's action in issuing a CUP to Black Point Estate.

special-use decisions made by appointed lay boards. Although such decisions are made pursuant to established criteria, there is little doubt that sensitivity to local concerns plays a role in decision-making because of the potential impact change has on neighboring land. Further, the primary expertise that such boards have is arguably in their capacity as representatives of community concerns. In this respect, they not only reflect their own natural biases, but it is not inappropriate to listen to community concerns.

Cordes, *supra,* at 209 (footnotes omitted).

*By the Court.*—Order affirmed.