[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM DECISION
This is an appeal by the plaintiff, Mario Pirozzilo, from a decision on March 2, 1999, by the defendant, Berlin inland Wetlands and Water Courses Commission ("commission"), ordering the plaintiff to restore his real property to the condition shown on a surveyor's map dated January 6, 1998. The appeal is taken pursuant to General Statutes § 22a-43.
The record of the proceedings before the commission may be summarized as follows. The plaintiff owns a home at 85 Rivergate Lane, Berlin. On August 27, 1997, James P. Horbal, an agent of the commission, wrote to the plaintiff advising him that an unauthorized encroachment[1] had been made on a regulated area on his property-essentially clearing along Bradley Brook, bordering his property. He was ordered to cease and desist immediately from any further activity. (Return of Record, ("ROR"), Item 1, p. 1.) During a commission meeting of October 7, 1997, Horbal reported that the plaintiff was working with his staff to resolve the matter. (ROR, Item 28.) On November 4, 1997, the plaintiff and a civil engineer, Bart Bovee of MBA Engineering, appeared before the commission to indicate that Bovee would be preparing a mitigation plan on behalf of the plaintiff. (ROR, Item 29. p. 15.)
The mitigation plan was presented to the commission at its January 6, 1998 meeting, and the commission voted to approve the plan. Since it was wintertime and the plan called for landscaping. the commission selected the date of May 15, 1998 for the completion of the plan. (ROR, Item 31, p. 14.) The plaintiff acceded to the plan, stating "I will definitely do what needs to be done." (ROR, Item 31, p. 12.) Horbal formally notified the plaintiff of the approval of the plan on January 22, 1998. (ROR. Item 4.) No appeal was taken from the cease and desist order or the subsequent approval of the plan. CT Page 5521-cc
Even though the plaintiff had committed himself to the mitigation plan, he worsened the situation on Memorial Day weekend, 1998, when he brought in 619 cubic yards of fill (thirty truckloads) to his back yard. (ROR, Item 35, p. 17; Item 39, p. 29: Item 40, p. 7.) On June 10, 1998, Horbal informed the plaintiff that he was in violation of the commission's regulations and ordered him to cease and desist. "I find no indication of any permit that would allow for your activities within this designated wetland nonencroachment area and flood hazard zone." (ROR, Item 5.) The Army Corps of Engineers investigated the matter and estimated that approximately .85 acres of wetlands and flood plain were filled. (ROR, Items 6 and 7.)
For the next seven months, the plaintiff and the commission conducted hearings on what remedy. if any, should be imposed upon the plaintiff for the alleged encroachment. The plaintiff employed a soil scientist, George Logan, to develop a response to the commission. On August 4, 1998, Logan informed the commission that he believed that the wetland line recognized by the commission and the subdivision developer in 1986 may not be accurate and that he would be surveying the property to determine the true wetland boundary. Since the early 1990s, the department of environmental protection had required field verification of wetlands, as opposed to the method used in preparing the subdivision map. (ROR, Item 34, pp. 2, 5.)
At the October 6. 1998 commission hearing. Logan demonstrated that the field delineated wetlands line differed from the established wetlands line. He concluded, based upon the field delineated wetlands line, that the plaintiff had filled 4885 square feet of wetlands. (ROR, Item 35. p. 5.) The commission chairperson advised Logan that any change in the established wetland boundary could only be accomplished through an application to change the wetlands boundary. (ROR. Item 35, p. 10.)[2]
With regard to the fill that had been placed in the flood plain, Logan stated that the increase in the 100-year flood elevation caused by the flood plain filling was .0068 inches downstream. (ROR, Item 35, p. 24.) No calculations were provided for the upstream impact.
During its October 6, 1998, November 3, 1998, February 2, 1999, and March 2, 1999 hearings, the commission considered the matter, including the plans submitted by the plaintiff. These plans proposed removing the fill from the redelineated wetlands, but would leave the fill deposited in the flood plain. (ROR, Item 35, pp. 19-20.) The commission was concerned that the deposit of fill within the flood plain without CT Page 5521-cd providing flood storage compensation equal to the volume of fill would cause harm upstream from the fill area. (ROR, Item 39, p. 9.) After these several hearings, on March 2, 1999, the commission voted without dissent to require the plaintiff to restore the property to the condition depicted on the mitigation plan it accepted on January 6, 1998, rather than accepting any of the proposals advanced by the plaintiff. (ROR, Item 40, pp. 33-34.) The plaintiff has appealed from the March 2, 1999 order.[3]
The court first addresses a ground of the plaintiffs appeal that the cease and desist orders of August 27, 1997 and June 10, 1998 are illegal. The plaintiffs appeal is dated March 26, 1999, and plainly states that it is taken from the order published March 11, 1999 — the March 2, 1999 order, ROR. Item 21. From this it is evident that the plaintiff did not timely appeal from the August 27, 1997 cease and desist order or the commission's acceptance of the mitigation plan on January 6, 1998. As our Supreme Court has stated: "(W)e have ordinarily recognized that the failure of a party to appeal from the action of a zoning authority renders that action final so that the correctness of that action is no longer subject to review by a court. Haynes v. PowerFacility Evaluation Council, 177 Conn. 623, 629-30, 419 A.2d 342 (1979); see Beit Havurah v. Zoning Board of Appeals, 177 Conn. 440, 418 A.2d 82
(1979)." Upjohn Co. v. Zoning Board of Appeals, 224 Conn. 96, 102
(1992). R. Fuller, 9A Connecticut Practice Series: Land Use Law and Practice (2d Ed. 1999) § 36.4. p. 233. summarizes the law as follows: "The concept of finality of judgments also comes up where a party that could have pursued an appeal fails to do so and attempts to raise similar issues in another type of proceeding. The cases hold that this cannot be done." The court is. therefore, precluded from ruling on the legality of the first cease and desist order issued by Horbal, as well as the proceedings of the commission that led to its acceptance of the mitigation plan on January 6, 1998.
With regard to Horbal's June 10. 1998 order, while General Statutes § 22a-43 (a) allows an appeal from any order issued by the commission's agent under § 22a-44 (a), such an appeal would certainly be from a preliminary ruling. Section 22a-44 (a) requires the commission to hold a hearing after its agent issues a cease and desist order to determine whether its agent's order should remain in effect, thus making the cease and desist order preliminary. See R. Fuller, 9A Connecticut Practice Series, Land Use Law (2d Ed. 1999), § 36.3. The plaintiff was not obliged to appeal from the preliminary ruling and his issues are preserved to his appeal from the final decision of March 2, 1999. CT Page 5521-ce
The first issue raised regarding the June 10, 1998, order is that Horbal was without jurisdiction to issue the order, because the commission lacks inland wetland authority. The plaintiff is not correct on this point. Section 22a-42 (c) requires municipalities to establish an inland wetlands agency and to promulgate regulations. The commission and its regulations, ROR, Item 41, meet this statutory requirement. Red HillCoalition, Inc. v. Conservation Commission, 212 Conn. 710, 720 (1989).
The plaintiff further argues that Horbal had no jurisdiction to issue his order based upon the plaintiffs activities in the flood plain. Under General Statutes § 7-148 (c) (7) (A) (i), municipalities are authorized to pass ordinances concerning housing safety. In furtherance thereof, the town of Berlin adopted an ordinance establishing flood plain management regulations for special flood hazard areas. (ROR, Item 42.) Section V(1) of the ordinance designates the commission as the municipal commission authorized to review the enforcement and administration of the ordinance. (ROR, Item 42, p. 13.) While Section V(1) describes the building inspector as the administrator of the ordinance, Section 1 defines "Building Inspector" to include "his authorized agent." Here, the record supports the conclusion that Horbal was the authorized agent of the building inspector. See, e.g., ROR, Item 1 (copy of notice sent to building official); Alfred Fox Piano Co. v. Bennett, 96 Conn. 448, 450
(1921). Therefore, the court concludes that Horbal's cease and desist order of June 10, 1998 was properly issued.
The commission, as required by General Statutes § 22a-44 (a), proceeded to hearings on the legitimacy of Horbal's cease and desist order, concluding it should stand and that the plaintiff must undertake a restoration project along Bradley Brook. In his appeal, the plaintiff claimns that the commission's decision was affected by the personal bias of its members. During the course of the hearings before the commission after Horbal's second cease and desist order, the commission members displayed little sympathy for the plaintiff, who was perceived as a scofflaw. One commissioner declared: "But, he defied us." Another wondered whether the plaintiff intended to follow any plan approved by the commission: "[H]e was also saying that this is the Land of the Free and Home of the Brave." The chairman asks for patience: "I know, but . . . that's what it is and we can't change that. But, we have to, I think were responsible to ask ourselves what's in the best interest of the Town of Berlin." (ROR, Item 35, p. 33.)
At the commission hearing of November 3. 1998,[4] Logan made a further explanation of the plaintiffs proposed mitigation plan near the CT Page 5521-cf wetlands buffer zone. "[The plaintiff] wants some wild flower bed and some beds and things like that. He has all these kinds of interesting ideas, being an Italian, I guess, the Italians like gardens; I like gardens, too." A commissioner then stated: "Some of the Italians are wopsided." Logan replied: "Lopsided?" The commissioner stated: "Wopsided." Logan again replied: "Wopsided, yes, O.K., got you." (ROR, Item 36, pp. 3, 4.)[5]
The court must address two issues raised by the plaintiff drawn from the statements set forth above. The court has reviewed the record and does not believe the commission's annoyance with the plaintiff for dumping the fill is sufficient to overturn its decision. "[Tlhere is a presumption . . . that administrative board members acting in an adjudicative capacity are not biased . . . To overcome the presumption. the plaintiff . . . must demonstrate actual bias, rather than mere potential bias, of the board members challenged. unless the circumstances indicate a probability of such bias too high to be constitutionally tolerable . . . The plaintiff has the burden of establishing a disqualifying interest." (Citations omitted; internal quotation marks omitted.) OG Industries, Inc. v. Planning Zoning Commission,232 Conn. 419, 429-30 (1995) (negative comments about gravel processing operations did not show actual bias); Lage v. Zoning Board of Appeals,148 Conn. 597. 604 (1961) (commissioner's remarks indicating preconceived opinion about desirability of zoning change constitute bias); Furtney v.Zoning Commission, 159 Conn. 585, 594 (1970) (there was no evidence that commissioner had ever taken a definite and unalterable position with reference to the proposed zoning change).
Here, as seen above, the chairman of the commission reminded the members that the remedial order must be issued solely with the interests of the town in mind. At the February 2, 1999 meeting, several commissioners stated that they were annoyed with the plaintiff but were not committed to a final decision. (ROR. Item 39, pp. 43-44.) The commissioners' hostility to the plaintiff does not amount to bias.Vermont Board of Health v. Waterbury, 274 A.2d 495. 499 (Vt. 1970) (commissioner's impatience with appellant's presentation did not constitute bias). As the Supremne Court remarked in Cioffoletti v.Planning Zoning Commission, 209 Conn. 544, 555 (1989):[6] "The human mind . . . is no blank piece of paper . . . Interests, points of view, preferences, are the essence of living. . . An `open mind,' in the sense of a mind containing no preconceptions whatever, would be a mind incapable of learning anything, (and) would be that of an utterly emotionless human being . . ." (Brackets omitted; citation omitted.) CT Page 5521-cg
The ethnic remark presents, however, a different level of concern. The Supreme Court has warned commissioners about using offensive language under similar circumstances as follows: "The transcripts of the hearing are . . . replete with remarks by the chairperson and panel members that, albeit intended as humor, were made at the expense of the plaintiff and lend an air of impropriety and bias to the hearings. Such actions are inappropriate at any administrative hearing and are especially inappropriate at one involving so grave an issue as license suspension. An administrative hearing does not have to match the model of a trial in court . . . It must, however, meet some modicum of orderly and fair procedure . . . We strongly caution administrative agencies to observe the proper decorum during agency hearings, particularly when the agency is functioning in a quasi-judicial capacity. (Citations omitted; internal quotation marks omitted). Pet v. Department of Health Services,228 Conn. 651, 661-62n. 11 (1994).
The commissioner's use of an ethnic epithet[7] leads the court to a finding of lack of impartiality. This was more serious than an incident where a commissioner compared a zoning applicant to a convicted felon, and there the court found prejudice. See Marris v. City of Cedarburg,498 N.W.2d 842, 849 (Wis. 1993). See also Colao v. Prince George'sCounty, 675 A.2d 148, 166, aff'd., 697 A.2d 96 (1996) (a personal attack on applicant by zoning board member going beyond sincere political and philosophical views would be illegal); 2 Davis, Administrative Law Treatise (4th ed. 2002), p. 660: "Impermissible personal bias includes . . . bias against an individual based on the individual's . . . ethnic origin."
Further, the court cannot overlook the statement as mere levity. In a zoning proceeding in Rhode Island, a commissioner, several months before the board's action, told a neighbor opposed to the proposed change: "What difference does it make, we are going to shove it down your throats anyway." The city solicitor argued that the commissioner's remarks should be overlooked as "more or less loose talk or idle banter between friends at a time when the application was not pending before the board." The Rhode island Supreme Court rejected that approach:
 The difficulty with thus dismissing petitioners' [appeal] is that members of a zoning board are vested with a substantial measure of quasi-judicial power under the local law regulating the use of land within their jurisdiction. In the exercise of that power they are called upon to perform the always delicate duty, CT Page 5521-ch as in the case at bar. of deciding whether or not a landowner may be granted a special exemption or privilege from compliance with the law which binds all others who own land in the same district. Such a power must be exercised with strict impartiality or there will inevitably result a loss of public confidence in the policy of the zoning ordinance and in the integrity of the officials charged with the responsibility of administering it. A member of a zoning board, therefore, should not in any matter affecting the granting or denying of applications for exceptions or variances say or do anything which would furnish a basis for raising an inference that he was biased in favor of one side or the other.
Barbara Realty Co. v. Zoning Bd. of Review, 128 A.2d 342, 344 (1957).
The commission's attorney conceded at oral argument that using the epithet was wrong. but contended that the remedy was that set forth inMurach v. Planning Zoning Commission, 196 Conn. 192 (1985). He suggested that this court, in light of Murach, should merely void the vote of the commissioner who made the inappropriate remarks and then uphold the order on the unanimous action of the remaining members. The court declines to apply Murach in this instance.
The Supreme Court in Murach, in holding a commissioner's ineligibility to serve on a planning and zoning commission did not disturb the outcome of a vote by the commission, relied upon the trial court's finding that the commissioner's "role in this matter was minimal." His actions did not "influence or sway the other members of the commission." He was but one of seven members who unanimously endorsed the zoning change. His participation did not "impair the integrity of the decision-making process." Murach v. Planning Zoning Commission supra, 196 Conn. 204-07. Here, of course, a prejudicial remark was made during a hearing with all the other members of the commission present (who gave no response) and with the public in attendance as well. The hearings and deliberations occurred in an atmosphere of animosity toward the plaintiff.
This incident, unlike the technical violation in Murach, acted to undermine public confidence in the administration of the commission's business. The appropriate remedy is to sustain the appeal.[8] SeeNazarko v. Conservation Commissions 50 Conn. App. 548, 552-53, cert. denied, 247 Conn. 940 (1998); Winslow v. Holderness Planning Board,480 A.2d 114, 117 (N.H. 1984). citing Berkshire Employees Ass'n v.CT Page 5521-ciN.L.R.B., 121 F.2d 235, 239 (3rd Cir. 1941) ("Litigants are entitled to an impartial tribunal whether it consists of one man or twenty and there is no way which we know of whereby the influence of one upon the others can be quantitatively measured").
The appeal from the commission's order of March 2, 1999. is hereby sustained.