STATE EX REL. COVENANT HARBOR BIBLE CAMP, Appellant, v. STEINKE, Building Inspector, and another, Respondents.

*April 9—May 5, 1959.*

For the appellant there was a brief by *Rieser, Stafford, Lesselyoung & Rosenbaum* of Madison, and oral argument by *Nicholas J. Lesselyoung* and *Willard S. Stafford.*

For the respondents there was a brief and oral argument by *Hugh L. Burdick* of Lake Geneva, attorney, and *J. Arthur Moran* of Delavan of counsel.

FAIRCHILD, J.   The parties agree that relator's use of its premises for a bible camp is nonconforming.   Respondents take the position that this use has been nonconforming ever since ordinance No. 237 was enacted in 1949.   Relator apparently takes the position that this use conformed to the ordinance until ordinance No. 265 was enacted in 1953, removing certain enumerated uses from the list of uses permitted in the district in which relator's property is located.   Since the extent of relator's use of the premises was

increased in 1951 by the construction of three cabins, the extent of the nonconforming use protected by the zoning ordinance depends upon whether relator's use became nonconforming in 1949 or in 1953.

We are of the opinion that relator's use of the premises for a bible camp became nonconforming at the time of the amendment of the ordinance in 1953. At the time relator acquired the property and began the bible camp, the ordinance in effect did not expressly authorize bible camps, but authorized uses for residence, rooming or boarding house, church, and school, and further, in the event of consent by neighbors, authorized issuing permits for business, industrial, mercantile, manufacturing, or storage use. The city expressly permitted relator to construct buildings for the bible-camp use. Evidently, it is conceded that this was either the granting of an authorized special permit or was an administrative construction of the list of permitted uses as covering the use proposed by relator.

In 1951 the city issued permits for construction of three cabins which enlarged the residence capacity of the camp. At that time the list of permitted uses still included churches and two other categories, the meaning of which was open to interpretation of considerable latitude, i.e., "boarding-and-lodging parochial schools" and "organized quasi-public recreational . . . buildings and grounds." We think that the permits issued in 1951 are not to be considered as unauthorized permits, but should be treated as administrative construction of the ordinance as permitting the use which relator was making.

Thus at the time that the relator's use of the property became nonconforming in 1953, its bible camp had a capacity approximately the same as it had just prior to the fire which destroyed the family residence in 1957. The only addition after 1953 appears to have been the so-called cook's cabin, the permit for which was not authorized by the ordinance.

The bible-camp use, under the terms of the ordinance, could be continued but not extended. Very shortly after the family residence was destroyed by fire in January, 1957, the city attorney advised relator that because the bible camp was a nonconforming use and because the family residence had been completely destroyed, relator could not replace that building. We shall first address ourselves to the question of whether this advice was correct. The city attorney relied upon the provision of the ordinance that when a building containing a nonconforming use is damaged by fire to the extent of more than 50 per cent of its current local assessed value, it shall not be restored except in conformity with the ordinance.

Relator points out that its bible camp constitutes a single use, that it is carried on in a number of different buildings, the use of each being an integral part of the one use of the premises—the bible camp. The respondents and the city attorney emphasize the fact that the ordinance refers to "a building containing a nonconforming use" in the singular and not the plural. It may be observed that in the situation before us, no one building contains the entire nonconforming use (the bible camp) and that there is authority for construing a word in the singular in a statute as if it were plural. Sec. 990.001 (1), Stats.; 50 Am. Jur., Statutes, p. 251, sec. 256.

Ordinances of the type relied upon have been generally upheld as constitutional. A number of cases are cited in Rhyne, Municipal Law (1957 ed.), pp. 915, 916, sec. 32.30; 1 Antieau, Mun. Corp., p. 447, sec. 7.07. We have not, however, found a decision discussing the type of situation which is before us in this case. In some of the cases like *Palazzola v. Gulfport* (1951), 211 Miss. 737, 52 So. (2d) 611, the building destroyed was the only building on the property. In some like *Baird v. Bradley* (1952), 109 Cal. App. (2d) 365, 240 Pac. (2d) 1016, the building destroyed did not

conform to structural requirements. In *State v. Hillman* (1929), 110 Conn. 92, 147 Atl. 294, several buildings devoted to the same use were involved, but it appears from the statement of facts that more than the required percentage had been destroyed, taking all the buildings together.

It appears to be an accepted principle that "The spirit of zoning is to restrict rather than increase a nonconforming use and to eliminate such uses as speedily as possible." 2 Rathkopf, Law of Zoning and Planning (3d ed.), p. 75. Legislatures have generally refrained from requiring an immediate discontinuance of nonconforming uses presumably because of doubt that such a provision would be constitutional. See 1 Antieau, Mun. Corp., p. 444, sec. 7.07; Willis, The Elimination of Nonconforming Uses, 1951 Wisconsin Law Review, 685. Evidently courts have considered that where a nonconforming use has been carried on in a building which has been accidentally destroyed in large measure, it is not unreasonable to compel the owner to conform to zoning requirements thereafter. The investment in an improvement which may not be readily adaptable to a conforming use has been taken away from him by the accident and not by the ordinance. With the improvement substantially destroyed, the land on which it is located will presumably have approximately as much value for use in conformity with the ordinance as otherwise, and the public interest in conformity with the ordinance will be served if he is not permitted to continue the nonconforming use.

Granting that the position of respondents could be sustained if in the case before us the building destroyed had been devoted to a separate nonconforming use, that is not the situation presented. The 50 per cent rule, which may be reasonable if applied to one building containing a separate use, may not be reasonable if applied to an individual building used jointly with other buildings in a single nonconforming use upon one premises. At least the theory which has

been suggested for sustaining the 50 per cent rule would not apply in the latter type of case. Suppose that the value of the destroyed building were only 15 or 20 per cent of the value of all relator's buildings, but that the loss of 50 per cent of the sleeping quarters of the camp would make continuance of the camp financially impossible. Suppose that one property is used for an institution or industry housed in several buildings, no one of which is worth as much as half the total but each of which is essential to the operation of the whole. In situations of the type suggested the application of the 50 per cent rule to the individual building might well result in a substantial loss of investment out of all proportion to the value of the building destroyed by accident. We therefore conclude that the 50 per cent rule should not be interpreted in accordance with the views of the respondents in a situation such as the one before us.

In the case before us the buildings have not been assessed because the use makes the property exempt from taxation. Assessed value, however, is required by law to equal fair market value and the fair market value could be determined by evidence. We conclude that the question of whether relator had the right to restore the family residence without changing it to a conforming use depends upon whether the fair market value of the destroyed building prior to its destruction was more than 50 per cent of the fair market value of all the buildings on the premises (excluding the cook's cabin) used by relator for its bible camp. If the value of the one building was not more than 50 per cent of the total, then relator could have "restored" the destroyed building.

We do not think that relator's only right would have been to erect a structure identical to the building destroyed but the reasonable construction of the word "restore" is not before us in this case. Relator's intention here was to replace the residence capacity of the destroyed building by building

six cabins in a part of the premises some distance away from the building which was destroyed by fire. It is our opinion that even if the values were such that relator had the right to restore the destroyed building, relator could not as a matter of right replace it with different buildings at a different site. Relator's desire to do so would have to have been considered by the board of appeals under the provisions of the ordinance empowering the board to grant a variance. In deciding whether to grant a variance the board would have had to proceed upon the premise that the relator was entitled to restore the destroyed building if it chose.

Under the circumstances we deem that the judgment should be reversed and the matter should be remanded to the circuit court. Sec. 62.23 (7) (e) 10 to 15, Stats., authorizes the circuit court to review the decision of the board of appeals by certiorari. Par. 13 permits the court to take evidence. We leave it to the discretion of the circuit court whether to hear evidence on value to determine whether relator has a right to restore the destroyed building and then to reverse the decision and remand the matter to the board of appeals for consideration of the matter of granting a variance or whether the court should at once reverse the board's decision and remand the entire matter for further hearing and determination by the board in accordance with the conclusions stated in this opinion.

*By the Court.*—Judgment reversed, and cause remanded for further proceedings not inconsistent with the opinion filed herein; appeal from order dismissed.