CITY OF LAKE GENEVA, Respondent, v. SMUDA, and another, Appellants.

*No. 790 (1974). Submitted on briefs October 7, 1976.—
Decided February 1, 1977.*
(Also reported in 249 N. W. 2d 783.)

For the appellants the cause was submitted on the brief of *Leslie L. Johnson* and *Davies, Thorson, O'Brien & Johnson* of Elkhorn.

For the respondent the cause was submitted on the brief of *John B. Christians,* city attorney, and *Christians & Torhorst* of Lake Geneva.

DAY, J.   The City of Lake Geneva, a municipal corporation, brought action in circuit court to permanently restrain Frank P. Smuda and Libby A. Smuda, defendants, from maintaining a nonconforming use on their premises contrary to a city zoning ordinance.  After a trial before the court, judgment was entered in favor of the city.

The principal issues on appeal are:

1.   Is the lower court finding that a valid nonconforming use did not exist at the time of the adoption of the ordinance against the great weight and clear preponderance of the evidence?

2.   Was the 1949 ordinance of the city valid?

The Smudas were served on February 28, 1972 in Berwyn, Illinois with a complaint in which the city prayed for a judgment forever restraining them from using premises they owned as a two-family residence

contrary to Lake Geneva's zoning ordinance. By answer, the defendants admitted that the house located in the city of Lake Geneva was used as a two-family residence in an area restricted under the zoning ordinance to one-family dwellings. For an affirmative defense, the Smudas alleged that they and their predecessors in title maintained the premises as a two-family residence since 1947 and this constituted a valid nonconforming use. At trial the Smudas also attacked the validity of the city of Lake Geneva's zoning ordinance passed in 1949. In a memorandum decision, the lower court found that the defendants had failed to prove there existed a nonconforming use at the time the 1949 ordinance became effective and that the ordinance was valid. A permanent injunction was granted on August 21, 1974 and an amended judgment dated November 20, 1974 deleted the assessment of costs that had been previously awarded. Mr. and Mrs. Smuda purchased the house in May 1969 without knowledge of zoning restrictions as to its use and considered that they owned a two flat building. The house is located on the shore of Lake Geneva and is commonly referred to as the "Boat House." Originally it was a one-story structure.

Mr. Otto Jacobs, a contractor, testified that sometime before 1949 Dr. Wells, the then owner of the Boat House, hired him to construct a second-story apartment. It was built as a separate dwelling unit with its own kitchen, bath, bedroom and living room and was separate from the downstairs occupied by Dr. Wells. Each unit had its own heating system and furnace though they shared one gas and electric service. He testified that Dr. Wells had a caretaker named John Denbessen who lived with Dr. Wells before the upper unit was constructed. Mr. Jacobs testified that Mr. Denbessen moved into the new unit when it was constructed and stayed there until Dr. Wells died in 1963. He further testified that he was told

by Dr. Wells that the upstairs apartment was built for the use of Mr. Denbessen and that he, Jacobs, visited Mr. Denbessen in the upper unit but he did not know whether Denbessen slept there or kept his clothes there.

Other testimony established other uses for the upper floor during that period of time, at least during the summer. Dr. Wells' daughter, Mrs. Doris Fechtmeyer of Florida, was deposed in Florida and this testimony was admitted at the trial. She testified she lived in the house for about six weeks each summer between 1947 and 1955. Though she had no direct knowledge of its use during the other part of the year she insisted she had "indirect knowledge" that her parents never rented the upper floor. When she visited she would sometimes sleep downstairs, sometimes upstairs. Occasionally she cooked upstairs, and many times she took her meals there without her parents. Other visitors who used the upstairs unit included her brother and family friends. She testified, "There was no upstairs apartment, it was a house."

Mr. A. M. Bearder, who lived on the adjoining property since approximately 1950, testified he did not think that Dr. Wells ever rented out the upper floor. He said the Wells family had a caretaker because Dr. Wells was so frequently in Chicago or Florida. From Dr. Wells' death in 1963 until 1965 when the house was sold, Mrs. Fechtmeyer and Mrs. Wells used it in the summer. According to Mr. Bearder, it was empty the rest of those years and Mrs. Fechtmeyer testified that no one else occupied the premises during this period.

According to an affidavit of R. B. Arnold and Norma Jean Arnold, Mr. and Mrs. Fechtmeyer occupied the upper unit as a separate and distinct dwelling between 1955 and 1965. The basis of their knowledge was not stated and was contrary to the testimony of Mrs. Fechtmeyer. The house was owned between September 1965 and January 1968 by Robert Chody. He described the

upper unit as a six room apartment continuously and separately maintained and occupied by his father. During his ownership Robert Estes affied that he had resided at the Boat House for approximately seven years, which would make his occupancy contemporaneous with the Chody ownership, but did not state whether he occupied the upper or lower unit. Mr. Bearder testified that Mr. Chody never rented out the house.

In January 1968 the Boat House property was purchased by Robert and Jean Evans; Mr. Bearder testified that during the winter the Evanses rented out the downstairs but it was occupied by them in the summer. It was in May 1969 that the Smudas purchased the property. Mr. Smuda testified that Marcos Mendosa lived on the second floor at that time and remained for another year. From that point the upper unit was rented to a succession of couples with only an occasional break of one or two weeks. The property was occupied by two teachers at the time of the trial.

The statute which empowers cities to enact zoning ordinances exempts from their restrictions valid nonconforming uses. Sec. 62.23(7)(h), Stats. (1973).[5] A nonconforming use is an active and actual use of land and buildings which existed prior to the commencement of the zoning ordinance which has continued in the same

[5] "62.23(7)(h) *Nonconforming uses.* The lawful use of a building or premises existing at the time of the adoption or amendment of a zoning ordinance may be continued although such use does not conform with the provisions of the ordinance. Such nonconforming use may not be extended. The total structural repairs or alterations in such a nonconforming building shall not during its life exceed 50 per cent of the assessed value of the building unless permanently changed to a conforming use. If such nonconforming use is discontinued for a period of 12 months, any future use of the building and premises shall conform to the ordinance."

or related use until the present. *Walworth County v. Hartwell,* 62 Wis.2d 57, 60, 214 N.W.2d 288 (1974), *Gabe v. Cudahy,* 52 Wis.2d 13, 15, 16, 187 N.W.2d 874 (1971). The burden is on the property owner to demonstrate "active and actual" use which will exempt the owner from the restrictions of the ordinance.

"While the right to continue a valid nonconforming use is protected, the burden is upon the property owner to prove by a preponderance of the evidence that the nonconforming use was in existence at the time the ordinance was passed. *Gabe v. Cudahy, supra.* Likewise, he must prove that the use of the property prior to the effective date of the ordinance was so active and actual that it can be said he has acquired a 'vested interest' in its continuance. If the specific use was not so active and actual and was but casual and occasional, or if such a use was merely accessory or incidental to the principal use, then it cannot be said that the property owner had acquired a "vested interest" in the continuance of such a use and the status of nonconforming use will be denied." *Walworth County, supra,* 62 Wis.2d at 61.

The Smudas have the burden of demonstrating that the findings of the trial court are against the great weight and clear preponderance of the evidence. *Stueck v. LeDuc,* 57 Wis.2d 735, 741, 205 N.W.2d 139 (1973). The trial court found that the Smudas failed to prove a valid nonconforming use was in existence at the time the 1949 ordinance became effective. Specifically, the court found the testimony of Otto Jacobs concerning the alleged upper-unit occupancy by John Denbessen was insufficient to establish a two-family dwelling at the time the 1949 restrictions took effect. We hold that this finding by the trial court is not against the great weight and clear preponderance of the evidence.

Under the test set forth in *Walworth County v. Hartwell, supra,* the defendant must show that (1) a non-

conforming use was in existence at the time the ordinance was passed, and (2) the use of the property prior to the ordinance was so active and actual that it can be said the property owner acquired a vested interest in its continuance. A casual and occasional or accessory or incidental use does not create a vested interest. Moreover, "The spirit of zoning is to restrict rather than increase a nonconforming use and to eliminate such uses as speedily as possible. 2 Rathkopf, *Law of Zoning and Planning* (3 ed.) P. 75." *State ex rel. Covenant Harbor Bible Camp v. Steinke,* 7 Wis.2d 275, 283, 96 N.W.2d 356 (1959).

When the Smudas bought the Boat House the effective law was the 1962 zoning ordinance as revised in 1965 and 1969. We take judicial notice of the ordinance.[1] Here the defendant must prove that there existed a valid nonconforming use before the effective date of the ordinance and that the pre-ordinance use was itself lawful. *Town of Wilson v. Kunstmann,* 7 Wis.2d 387, 391, 96 N.W.2d 709 (1959); *David A. Ulrich, Inc. v. Saukville,* 7 Wis.2d 173, 180, 96 N.W.2d 612 (1959); *Ramaker v. Cities Service Oil Co.,* 27 Wis.2d 143, 150, 133 N.W.2d 789 (1965). To be lawful, the use must have been in conformity with the 1949 zoning ordinance which law was effective until it was repealed by the 1962 ordinance. The trial court was correct in its reference to the 1949 ordinance. That ordinance restricted residences in Residence District A to one family dwellings. Sec. 24.05 (1) (a). A one family dwelling is defined in sec. 24.03.9 as "A detached building designed for or occupied exclusively by one family." Sec. 24.03.12 defines "family" as

---

[1] "902.03 *County and city ordinances; administrative rules of state and federal agencies.* (1) The courts of this state, including the supreme court, shall take judicial notice of:

(a) County and municipal ordinances in those counties in which the particular court has jurisdiction; and . . . ."

"an individual or group of individuals related by blood, marriage or adoption, or not to exceed three persons not so related living, sleeping and eating together so as to form a family unit." The lower court noted that "Mr. Jacobs testified that he didn't see Mr. Denbessen sleep there and couldn't testify that he lived there all twelve months of the year or that he paid rent to Dr. Wells." Mrs. Fechtmeyer, Dr. Wells' daughter, testified that she occasionally used the upstairs apartment in her yearly visits to Lake Geneva. The findings of the trial court with respect to the occupancy of the second floor of the premises are not against the great and clear preponderance of the evidence. Because, as the trial court found, there was not a valid nonconforming use when the 1949 ordinance took effect, any subsequent nonconforming use would be illegal. Such subsequent use could not then qualify as an exemption from the 1962 ordinance as amended.

The defendants contend the 1949 zoning ordinance was invalid. They allege the ordinance was not properly published and therefore did not become effective pursuant to sec. 62.11(4)(a) Wis. Stats.[1.5] The defendants also argue that failure to establish a valid map at trial resulted in failure to prove a valid ordinance.

The 1949 City of Lake Geneva zoning ordinance was interpreted by this court in another context in *State ex rel. Covenant Harbor Bible Camp v. Steinke,* 7 Wis.2d

[1.5] "62.11 *Common council.*

". . .

"(4) *Publication.* (a) Proceedings of the council shall be published in the newspaper designated under s. 985.06 as a class 1 notice, under ch. 985. The proceedings for the purpose of publication shall include the substance of every official action taken by the governing body. Except as provided in this subsection all ordinances shall be published as a class 1 notice, under ch. 985, within 15 days of passage, and shall take effect on the day after its publication or at a later date if expressly prescribed."

275, 278, 96 N.W.2d 356 (1959). That case specifically stated that the ordinance was published.

At the time of the trial the proof of publication, consisting of a newspaper page setting out the statute, did not textually conform to the exhibit which was tendered as the ordinance. The court found that this defect was cured by sec. 889.04, Stats.[2] The tendered exhibit does purport to be published by the city and the first paragraph states that it is an ordinance to promote the health, safety, morals and general welfare and to regulate buildings, other structures and lot sizes, and other matters in the City of Lake Geneva, Wisconsin. The textual variations between the document and the ordinance published in the newspaper do not directly involve the use restrictions which are the matters before this court. The purported ordinance was continuously in the possession of the City of Lake Geneva keeper of documents, according to the testimony of the city clerk. In addition, the clerk identified the Record of Council Meetings and Actions which recited the passage of the ordinance on June 9, 1949. This testimony raised a presumption of regularity. *McKinnon v. Benedict*, 38 Wis.2d 607, 623, 157 N.W.2d 665 (1968). Under sec. 889.04, Stats., *supra,* this presumption is conclusive. Because the ordinance is valid in its own right, the codification provision of sec. 66.035,[3] which the defendants argue was not followed,

---

[2] "889.04 *County and municipal ordinances.* Matter printed in any newspaper, book, pamphlet, or other form purporting to be so published by any county, town, city or village in this state as a copy of its ordinance, bylaw, resolution or regulation, is prima facie evidence thereof; and after 3 years from the date of such publication, such book or pamphlet shall be conclusive proof of the regularity of the adoption and publication of the ordinance, bylaw, resolution or regulation."

[3] "66.035 *Code of ordinances.* The governing body of any city, town, county or village may authorize the preparation of a code,

is immaterial. That provision renders individual ordinances valid if codified even though the ordinances would be invalid standing alone.

The defendants finally argue that the ordinance is invalid because there is no proof of publication of an accompanying map and that this omission nullifies the zoning ordinance. A map was admitted at trial and identified as in the possession of the Keeper of Documents for the city. On its face the map purports to be the City of Lake Geneva Zoning Map and is dated April, 1949. It does not refer to the June, 1949 zoning ordinance. The ordinance itself refers to a map dated June 1, 1949. Sec. 62.23 (7) (a), which grants cities the power to zone, states in part, "this subsection and any ordinance, resolution or regulation . . . thereto, shall be liberally construed . . . as minimum requirements adopted for the purposes stated." The minimum requirements of the statute do not include publication of a map. "In view of the practical difficulty in publishing maps, it is unnecessary to publish a map which is part of the ordinance, provided that the map is accessible." Anderson, *American Law of Zoning* (1968 ed.), sec. 4.22 p. 196.

We hold, therefore, that the 1949 ordinance is valid.

*By the Court.*—Judgment affirmed.

---

or part thereof, of general ordinances of such municipality. Such code, or part thereof, may be adopted by an ordinance referring thereto and may be published in book or pamphlet form and such publication shall be sufficient even though the ordinances contained therein were not published in accordance with ss. 59.09, 60.29 (9), 61.50 (1) and 62.11 (4) (a). A copy of such code, or part thereof shall be permanently on file and open to public inspection in the office of the clerk after its adoption and for a period of not less than 2 weeks before its adoption. A code adopted by a county in accordance with the procedure provided in this section prior to April 30, 1965 shall be valid notwithstanding failure to comply with s. 59.09."