# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 10-1359

JOHN BETTENDORF,

*Plaintiff-Appellant,*

*v.*

ST. CROIX COUNTY and WISCONSIN MUNICIPAL
MUTUAL INSURANCE COMPANY,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 3:08-cv-00656-bbc—**Barbara B. Crabb**, *Judge.*

ARGUED SEPTEMBER 14, 2010—DECIDED JANUARY 20, 2011

Before BAUER, FLAUM and HAMILTON, *Circuit Judges.*

BAUER, *Circuit Judge.* This case arises from a dispute
between John Bettendorf and St. Croix County over
the zoning of Bettendorf's property. Pursuant to an ordi-
nance enacted by the County in 1985, a portion of
Bettendorf's land was re-zoned from agricultural-residen-
tial to commercial. The ordinance contained a condition
that the parcel would revert to agricultural-residential

upon the death of Bettendorf or by Bettendorf's transfer of the parcel to a new owner.

In 2004, Bettendorf filed an action in the Circuit Court for St. Croix County seeking a declaratory judgment that the conditional language was void and should be stricken from the ordinance. The circuit court found in favor of Bettendorf; on appeal, the Wisconsin Court of Appeals held the ordinance void in its entirety. In July 2007, the circuit court entered a revised judgment and order rescinding the commercial zoning of the disputed parcel in accordance with the Court of Appeals' decision. The County complied with the order and rescinded the commercial permit. The case comes to us from the Western District of Wisconsin; Bettendorf is alleging constitutional rights violations in connection with the County's rescinding the commercial zoning designation. After reviewing the district court's grant of summary judgment in favor of the County de novo, we affirm for the reasons set forth below.

## I. BACKGROUND

John Bettendorf owns property located in St. Croix County, a municipal entity and local government under Wisconsin law. When Bettendorf acquired the property, it was zoned agricultural-residential. In 1972, he began to operate a carpet sales and installation business out of his basement. By 1974, he was also operating an excavating company and a trucking company on the property.

In December 1984, Bettendorf applied to the St. Croix County Planning, Zoning, and Parks Committee to re-zone

a portion of his property to commercial so that he could operate a trucking terminal there. The committee approved the request on condition that the commercial re-zoning was only for Bettendorf's use and was not transferable. The committee's recommendation to grant a limited permit for Bettendorf to use the property for commercial activity was adopted and embodied in St. Croix County Ordinance No. 108(85) (1985). Bettendorf used the property in a commercial manner after the ordinance was enacted but his counsel at oral argument stated that he has discontinued such use since the ordinance was invalidated.

## II.  DISCUSSION

Bettendorf argues that the County's removal of the commercial zoning designation following the Court of Appeals' decision to invalidate the 1985 ordinance constitutes a taking. He also contends that the state court proceedings and resulting decision by the County to revoke the ordinance it had granted in 1985 did not provide adequate substantive and procedural due process protections. We disagree.

### A.  State Law Takings Claim

It is well-settled that to establish a regulatory taking for which just compensation is required under the Fifth Amendment and under Wisconsin law, the challenged government action must deprive a landowner of "all or substantially all practical uses of the property." *Eternalist Foundation, Inc. v. City of Platteville,* 225 Wis.2d 759, 773

(1999).[1] "All or substantially all" sets a high bar for a plaintiff to recover on a takings claim. A regulatory or "constructive" taking will only be found where a government regulation has "rendered the property practically useless for all reasonable purposes." *Zealy*, 194 Wis.2d at 708. The factors to be considered in determining whether a constructive taking has occurred include: (1) the nature of the government regulatory scheme, (2) the severity of the economic impact on the challenging landowner, and (3) the degree of interference with the landowner's anticipated and distinct investment opportunities. *Concrete Pipe and Prods. Inv. v. Construction Laborers Pension Trust*, 508 U.S. 602, 644-46 (1993); *Zealy,* 194 Wis.2d at 710. Bettendorf urges us to reverse the district court because it did not adequately consider the third factor. We believe it did.

---

[1] Bettendorf argues that *Eternalist* is not an accurate statement of Wisconsin takings law and criticizes the district court for discussing federal takings law in its opinion. However, since the Wisconsin courts seem to equate their state's takings jurisprudence with federal takings law, we decline to discuss any potential distinctions any further. *See, e.g., Wisconsin Medical Society, Inc. v. Morgan*, 787 N.W.2d 22, 33 (Wis. 2010) (holding that the Wisconsin Supreme Court will "generally apply the same standards that are used to determine whether a taking occurred under the Fifth Amendment to the United States Constitution" when deciding whether a taking has occurred under the Wisconsin Constitution)*; Zealy v. City of Waukesha,* 194 Wis.2d 701, 709 (1995) (holding that there is "no difference" between the takings law of Wisconsin and federal takings law).

The Takings Clause presupposes government interference with one's property rights in pursuit of a public purpose. *Lingle v. Chevron*, 544 U.S. 528, 543 (2005). As Judge Crabb noted in her opinion, Bettendorf freely agreed to the conditional zoning provision. Any improvements Bettendorf made to his property were completed with full knowledge that the commercial designation would ultimately be lost. Bettendorf knew the conditional language of the ordinance restricted his ability to recoup the value of his commercial investments when he was ready to sell and therefore petitioned the County to make the re-zoning permanent. When the County refused, it was Bettendorf who initiated litigation in order for the circuit court to construe the limits of the ordinance. While he hoped the litigation would result in a decision giving him greater freedom than the ordinance afforded him, the result instead limited the freedom he had previously enjoyed. That was a risk he assumed in asking the court to interpret the scope and validity of the ordinance, not a government interference with his investment opportunities.[2]

---

[2] Bettendorf also argues that he had "vested rights" to his own commercial use of the property. As this Court has noted, "property interests are created and defined by an independent source, such as a contract or state law." *General Auto Service Station v. City of Chicago*, 526 F.3d 991, 1000 (7th Cir. 2008). In the *General Auto Service Station* case, we acknowledged that, under Illinois state law, a property owner can acquire a property interest in continuing a land use that was lawful when commenced and was later rendered unlawful. *Id.* Whether Wis-

(continued...)

In concluding our discussion of the takings claim, we note that while Bettendorf did suffer as a result of losing the commercial designation to which he had grown accustomed, he retains full use of his property for agricultural and residential purposes. The County's action does not render the property "practically useless," as the takings jurisprudence requires. Rather, it restores the land to its intended use at the time Bettendorf acquired it. Finding no government intrusion and no deprivation of all or substantially all practical use of Bettendorf's property, we cannot find a compensable taking.

## B.  Due Process Claims

We now turn to Bettendorf's argument that substantive and procedural deficiencies violated his constitutional right to due process.

Specifically, Bettendorf claims he was "denied the protection of the substantive legal standards that would

---

[2] (...continued)

consin similarly protects its property owners is a matter of Wisconsin state law. Since Bettendorf only vaguely refers to the concept of "vested rights," we decline to exercise jurisdiction over any potential vested rights claim. In so doing, we follow the example set by this Court in *Petra Presbyterian Church v. Village of Northbrook,* 489 F.3d 846 (7th Cir. 2007). In that case, the Court affirmed the district court's dismissal of an Illinois "vested rights" claim for lack of jurisdiction. The Court also found no basis for a viable federal "vested rights" claim. *Id.* at 848-89.

have been applied to a change in zoning, as well as deprived of his right to a public hearing and consideration by the appropriate municipal decision makers." He contends the County deprived him of this right by failing to grant a petition for a complete re-zoning of his property when the validity of the commercial designation and its conditional language came into dispute. In support of this argument, Bettendorf directs the Court to Chapter 17 of the St. Croix County Code of Ordinances for Land Use and Development. Under Section 17.70(6)(a) of the Code, appeals of administrative zoning decisions may be brought by persons aggrieved by those decisions or by representatives of the County, so long as the appeal is made within a reasonable time. If the County were to revoke the commercial zoning permit it previously granted Bettendorf, as it did in this case, he argues the appropriate mechanism should have been the process outlined in the St. Croix County Code rather than the state court litigation that ultimately decided the matter.

Bettendorf correctly states that the Fourteenth Amendment protects against state action that deprives a person of property without due process of law and that such protection extends to action taken by municipalities such as St. Croix County. However, as the Court of Appeals of Wisconsin has noted, "A plaintiff who wishes to pursue a claim for an alleged violation of the right to substantive due process embarks on a difficult undertaking, especially if the claim involves zoning or other real property regulatory actions by a governmental body." *Eternalist*, 225 Wis.2d at 775.

At the outset, we note Judge Crabb's observation in the district court opinion that "it is not easy to make out what federal claims [Bettendorf] is raising." In his brief before this Court, Bettendorf conflates substantive and procedural due process, stating that the facts and the law supporting both claims are "largely indistinguishable." We disagree with this characterization. Substantive due process is implicated in cases like the one before us only when "a municipal body's adverse decision in a zoning matter . . . is arbitrary, oppressive, or unreasonable." *Id.* at 776. In contrast, procedural due process focuses on the "form of the procedures that the government must afford an individual" given the "particularities of the situation." *Doe v. Heck*, 327 F.3d 492, 526 (7th Cir. 2003), citing *Doyle v. Camelot Care Centers, Inc.*, 305 F.3d 603, 618 (7th Cir. 2002). While the former relates to the propriety of the decision itself, the latter is concerned with the manner in which a decision is made. As this Court has said repeatedly, the two are not to be confused. *Tun v. Whitticker*, 398 F.3d 899, 902 (7th Cir. 2005); *Dunn v. Fairfield Community High School, District No. 225*, 158 F.3d 962 (7th Cir. 1998).

### 1. Substantive Due Process

Bettendorf's argument primarily focuses on procedural due process, but since he has also put substantive due process at issue, we will briefly address why he fails to make out a compensable claim for a substantive due process violation.

Substantive due process is admittedly an "amorphous" concept. *Tun*, 398 F.3d at 900. It is perhaps for this reason that its scope remains "very limited." *Id.* at 902 (citing *Washington v. Glucksberg*, 521 U.S. 702 (1997)). A government entity must have exercised its power without reasonable justification in a manner that "shocks the conscience" in order for a plaintiff to recover on substantive due process grounds. *Tun*, 398 F.3d at 902 (quoting *Rochin v. California*, 342 U.S. 165 (1952)).

The County's decision to revoke the commercial designation can hardly be considered conscious-shocking or arbitrary. After all, the action came in response to a judgment and court order invalidating the ordinance which purported to give Bettendorf the right to exploit his property for a commercial purpose. In our view, noncompliance with the court order would have been more problematic than what resulted here. Since the County was merely complying with a judgment from the Wisconsin Court of Appeals, we find that the action taken was utterly reasonable and not a violation of substantive due process.

If Bettendorf is arguing that the County's actions took away his property rights in an arbitrary and capricious way without compensating him for the loss, the proper constitutional rubric to consider would be the takings jurisprudence, which we have already discussed and do not find applicable here. Finding no taking and no violation of substantive due process, we now turn to the last question in this case, namely whether state court litigation provided adequate process, given that the

County had its own alternative procedures for resolving zoning disputes.

### 2. Procedural Due Process

In order to prevail on a procedural due process claim, a property owner must show that he was deprived of a full and fair hearing to adjudicate his rights. Where a claimant has availed himself of the remedies guaranteed by state law, due process is satisfied unless he can show that such remedies were inadequate. *Hudson v. Palmer,* 468 U.S. 517, 539 (1984). The fundamental requirement is an "opportunity to be heard . . . 'granted at a meaningful time and in a meaningful manner.'" *Parratt v. Taylor,* 451 U.S. 527, 540 (1981) (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552 (1965)). As this Court has noted, due process is "flexible, requiring different procedural protections depending upon the situation at hand." *Doyle,* 305 F.3d at 618. For the reasons below, we find Bettendorf was afforded adequate process in the state court system and will not reverse on procedural due process grounds.

In this case, the plaintiff himself initiated state court review of the ordinance which was ultimately held invalid. Knowing that the County's position on appeal was that the ordinance was invalid in its entirety, Bettendorf was on notice that the ordinance could be struck down and his commercial rights rescinded. Nothing in the record indicates that he was denied a full and fair opportunity to rebut the County's position before the Wisconsin Court of Appeals. Bettendorf

claims the state court process was inadequate, but he initiated that process himself and could have instead chosen to confine the proceedings to the appeals process set forth in the St. Croix County Code. The fact that he bypassed an appeals process which he now suggests must be followed as a matter of constitutional fairness seriously undermines his argument that the state court process was deficient. Against the backdrop of events leading up to this Court's decision, Bettendorf's procedural due process argument strikes us as a last ditch effort to undo the adequate process because it did not produce the anticipated result.

As Judge Crabb put it, the fact that an alternative remedy existed in the St. Croix County Code is "irrelevant." So long as a separate, constitutionally adequate path was employed, there can be no procedural due process violation under the flexible standards that govern. The Circuit Court for St. Croix County was asked to construe the validity of an ordinance, a task well within its discretion. The County appealed and the Wisconsin Court of Appeals responded with a reasoned and thorough analysis of the ordinance and its scope.

Bettendorf now claims the appeals process outlined in the County Code would have provided more or better process than the state court proceedings. This is speculative. It is also irrelevant. The due process clause requires that a claimant receive adequate process, not the most advantageous process available to him. In any event, we agree with the County that if Bettendorf thought the County's process was superior to litigating in state

court, the option to pursue that path was available to him when the County denied his request to make the commercial re-zoning permanent. Having chosen the constitutionally sound path of state court litigation, Bettendorf must now live with the consequences of that choice.

### III. CONCLUSION

Finding no taking and no violation of substantive or procedural due process, we AFFIRM.

HAMILTON, *Circuit Judge*, concurring in part and dissenting in part.  I agree with my colleagues that plaintiff Bettendorf has no viable due process claim here, and I join those portions of Judge Bauer's opinion. I respectfully dissent, however, from my colleagues' decision to affirm the dismissal of plaintiff's takings claim under state law.

The majority's decision gives our court's approval, on bare pleadings, to a rare and extraordinary burden on property rights. The majority is saying that a local government can first designate a lawful use of property, allowing a property owner to make substantial invest-

ments in the property and to use it that way for more than 20 years, and then state courts, at the request of the local government, can suddenly outlaw the continued use without compensation for the property owner.

To review the key facts, first, the plaintiff began using his land for a commercial use that was not then authorized by county zoning laws. The county could have taken enforcement action against him then but chose not to do so. Instead, at plaintiff's request, the county amended the zoning to allow commercial use of the property. In an unusual step, the county limited the commercial zoning designation to the period of plaintiff's ownership of the property, but it was clear that plaintiff was legally allowed to continue the commercial use as long as he owned the property and did not assign the commercial use to anyone else. The plaintiff relied on that change in the law and invested several hundred thousand dollars to take advantage of the new zoning. When the plaintiff filed a lawsuit in state court to remove the limitation to his own ownership of the property, he claims that the county went so far as to assert that he should be fined for his operation of a commercial enterprise on the property for the preceding 20 years. The state courts eventually concluded that the entire ordinance and special use permit were void, so that continued commercial use is now deemed illegal. The plaintiff can no longer use his property as he has lawfully used it since the zoning change in 1985.

The takings analysis here should be straightforward. I agree with my colleagues that there is no apparent

difference between federal and Wisconsin state takings analysis, so I draw on both sources of law in trying to predict how the Wisconsin Supreme Court would apply the law here. Plaintiff Bettendorf has what courts sometimes call "vested rights"—and more recently call "investment-backed expectations"—in his continued use of the property in a way that has been lawful for many years, and in which he made substantial investments. The loss of those vested rights and investments through a retroactive change of the zoning ordinance should be a compensable taking.

My colleagues dispose of Bettendorf's takings claim with a single footnote dedicated to the vested rights issue. They criticize plaintiff for referring "only vaguely" to his vested rights argument. *Ante* at 6 n.2. I disagree. The argument seems to me to be presented adequately. The unfairness of the change in the local law, upsetting plaintiff's reasonable reliance and undermining his substantial investments, is palpable and obvious. It does not take an elaborate argument to put the issue squarely before a state or federal court. In other words, there is no need for a separate "vested rights" claim under federal law or state law. The concept can be understood as simply part of the regulatory takings claim that plaintiff has asserted under Wisconsin law.

The label "vested right" is a shorthand and conclusory label in property law for important property rights resulting from prior transactions, contracts, and uses of property. The concept has a long and winding history as an integral part of American property law, from the

earliest days of the union. See, *e.g.*, *Vanhorne's Lessee v. Dorrance*, 2 Dall. 304, 311, 1 L. Ed. 391 (C.C.D. Pa. 1795) ("It is immaterial to the state, in which of its citizens the land is vested; but it is of primary importance, that, when vested, it should be secured, and the proprietor protected in the enjoyment of it. The constitution encircles, and renders it an holy thing."); *Fletcher v. Peck*, 10 U.S. 87, 135 (1810) ("When, then, a law is in its nature a contract, when absolute rights have vested under that contract, a repeal of the law cannot devest those rights."); *Wilkinson v. Leland*, 27 U.S. 627, 658 (1829) ("We know of no case, in which a legislative act to transfer the property of A. to B. without his consent, has ever been held a constitutional exercise of legislative power. . . On the contrary, it has been constantly resisted as inconsistent with just principles, by every judicial tribunal in which it has been attempted to be enforced.").

The concept of vested rights has not had just a single home in the law. It has evolved primarily as a doctrine of state common law or constitutional law, and it also can be embodied in state and local zoning and similar statutory schemes. See, *e.g.*, *Bickerstaff Clay Products Co. v. Harris County*, 89 F.3d 1481, 1487 (11th Cir. 1996) (doctrine of vested rights applied by district court derived from doctrine of equitable estoppel); *Lakeview Development Corp. v. City of South Lake Tahoe*, 915 F.2d 1290, 1294-95 (9th Cir. 1990) (vested rights doctrine was concept of state law, a species of government estoppel); *Lake Bluff Housing Partners v. City of South Milwaukee*, 540 N.W.2d 189 (Wis. 1995) (detailing the concept of vested rights in Wisconsin law); Wis. Stat. § 59.69(10)(a) (prohibiting

new zoning ordinances from interfering with existing lawful uses).

As a concept in federal constitutional law, vested rights emerged long before the Supreme Court recognized regulatory takings under the takings clauses of the Fifth and Fourteenth Amendments. See, *e.g.*, *In re Taylor*, 102 F. 728, 730 (7th Cir. 1900) (noting that if appellant had vested right in property in question, it could not be taken away without due process and a hearing in court); *City of Chicago v. New York, C. & St. L. R. Co.*, 216 F. 735, 738 (7th Cir. 1914) ("And of course a vested property right cannot be taken away without just compensation or due process of law."), citing *Grand Trunk W.R. Co. v. South Bend*, 227 U.S. 544 (1913); *Chicago Title & Trust Co. v. Bashford*, 97 N.W. 940, 941 (Wis. 1904) (devesting of vested right in property would violate due process clause of Fourteenth Amendment). Vested rights were long thought of as part of due process analysis, which can produce some confusion. Was the theory some form of substantive due process? And if not, how could more procedure justify the loss of those rights? Also, the "vested right" label has been ambiguous in at least one important respect. Are vested rights untouchable under any circumstances, or can the government interfere with them as long as it pays just compensation? But the concept of vested rights has migrated at least in part— perhaps it is still migrating—in constitutional law to the modern jurisprudence of regulatory takings, where it fits much more neatly. The government can take away the vested right, but only if it pays just compensation.

Under modern regulatory takings cases, whether a regulatory change interferes with the existing, lawful use of the property is a critical consideration in determining whether a compensable regulatory taking has occurred. See *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 136 (1978) (existing use of property was a consideration in evaluating whether there was a taking in seminal regulatory takings case). Let's take those elements one at a time.

First, plaintiff's commercial use has been lawful, at least since the 1985 amendment to the zoning ordinance. We should take for granted in American law that a property owner should be able to rely on the facial validity of local zoning ordinances. A property owner should be able to invest his or her own money, and lenders and investors should be able to take risks as well, based on compliance with the face of the local ordinances. It should not be necessary to test the validity of those ordinances in court before those investments can be made with confidence.

The lawfulness of plaintiff's commercial use distinguishes this case decisively from two cases cited by the majority that rejected vested rights claims when local governments took action to end uses of property that had been *illegal*. See *General Auto Service Station v. City of Chicago*, 526 F.3d 991, 1002 (7th Cir. 2008) (sign painted on side of building had been illegal for many years, and unlawfulness prevented owner from having acquired vested rights in use under state law); *Petra Presbyterian Church v. Village of Northbrook*, 489 F.3d 846, 848-49 (7th Cir. 2007) (church did not acquire vested

right by using warehouse illegally as church). In both cases, we rejected vested rights claims by distinguishing between prior uses that were legal and those that were illegal. These cases do not undermine Bettendorf's takings claim based on rights having vested in his prior *legal* use of his property.

Second, plaintiff has actually been making commercial use of the property since the 1985 amendment to the zoning ordinance. In regulatory takings jurisprudence, the fact that a regulatory change prohibits what had been an actual, lawful use ought to be decisive in the vast majority of cases, and probably including plaintiff Bettendorf's case.

That much is clear under the three-part test derived from *Penn Central* and *Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust*, 508 U.S. 602, 644-46 (1993). The three factors are (1) the nature of the government action, (2) the severity of the economic impact on the owner, and (3) the degree of interference with the owner's "reasonable investment-backed expectations." First, the nature of the government action in this case is a prohibition on what had been a lawful, established use. (In one of the puzzling aspects of this case, the sparse record here does not show any particular government interest that is served by prohibiting commercial use of plaintiff's property.) Second, the severity of the economic impact on the owner is difficult to gauge on the pleadings, but we should assume that it is substantial. Several hundred thousand dollars of investments will lose or have already lost much or perhaps all of their remaining value. (The bare

pleadings do not provide details about expected useful lives of buildings, depreciation schedules, salvage value, and the like, which would be needed to be more precise.) Third, there should be no doubt that the interference with "reasonable investment-backed expectations" is dramatic. The rather awkward phrase is most useful when applying the regulatory takings test to a government action that prohibits or modifies a planned future use of property when the property owner has already begun making substantial investments to prepare for the new use. The phrase also clearly applies to substantial investments in an established lawful use.

My colleagues explain away the third factor here by noting that the plaintiff freely agreed to the conditional zoning provision that limited the commercial zoning to his ownership of the property. That is correct, and the result should substantially reduce the amount of compensation that the plaintiff is due. His takings claim should not be decided as if he had a right to sell the property with the commercial zoning in place.[3] But he did have a right to expect the county to abide by the ordinance it enacted, allowing him to continue the commercial use as long as he owned the property. That expectation was entirely reasonable and was backed up with substantial investments.

---

[3] Properly calculating just compensation in this case would require some subtle calculations taking into account Bettendorf's life expectancy and the useful lives of his investments and their salvage value, among other factors.

My colleagues dismiss the third factor by disregarding the difference between having to stop the commercial use now and having to stop it some years hence, upon the plaintiff's death or sale of the property. It is as if we were telling a widow with a life estate in her residence that forcing her to leave the property now will not cause her any loss because she had only a limited right to begin with. The difference between the immediate prohibition on commercial use of plaintiff's property and the original limitation that he agreed to is equally significant.

The majority's dismissal of plaintiff's takings claim is inconsistent with a substantial body of regulatory takings law. When we survey regulatory takings cases, we see that a local government can usually prohibit a contemplated future use without effecting a regulatory taking, at least as long as the prohibition does not bar all economically viable use of the property. See *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015-16 (1992); *Eternalist Foundation, Inc. v. City of Platteville*, 593 N.W.2d 84, 90 (Wis. App. 1999); *Zealy v. City of Waukesha*, 548 N.W.2d 528, 531-32 (Wis. 1996), citing *Lucas*, 505 U.S. at 1016. Following the Supreme Court's decision in *Penn Central*, one of the usual lines of dispute in regulatory takings cases is whether the property owner has sufficient and reasonable "investment-backed expectations" in a *planned* use so as to give rise to a compensable regulatory taking. See *Palazzolo v. Rhode Island*, 533 U.S. 606, 617-18, 632 (2001) (remanding for examination of claims under *Penn Central*); *Concrete Pipe*, 508 U.S.

at 645-46 (1993) (evaluating the degree of interference with Concrete Pipe's "reasonable investment-backed expectations"); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1011 (1984) (explicit governmental guarantee formed the basis of a "reasonable investment-backed expectation"); see also *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922) (early regulatory takings case finding statute forbidding coal mining under houses a "taking"; considered by the *Penn Central* Court, 438 U.S. at 127, as the "leading case for the proposition that a state statute . . . may so frustrate distinct investment-backed expectations as to amount to a 'taking'"); *Zealy*, 548 N.W.2d at 531, quoting *Penn Central*, 438 U.S. at 124 (in evaluating whether there has been a regulatory taking, courts should consider "the character of the governmental action," the "economic impact of the regulation on the claimant," and the "extent to which the regulation has interfered with distinct investment-backed expectations").

The majority's rejection of the plaintiff's takings claim is inconsistent with these many regulatory taking cases deciding whether owners have made sufficient investments in *planned* future uses. If the majority is correct, if the government may simply prohibit what had been an existing lawful use of the property and avoid paying compensation so long as the property retains any economic value, then a discussion of investment-backed expectations required by the *Penn Central* balancing test would be utterly beside the point. The same could be said for the third factor ("the degree of interference with the landowner's anticipated and distinct invest-

ment opportunities") in the constructive takings test the majority takes from *Concrete Pipe*. *Ante* at 4, citing 508 U.S. at 644-46. Under the majority's approach to the takings question, the courts considering the *Penn Central* or *Concrete Pipe* factors should simply say that the government can change the rules whenever it likes, without causing a compensable taking, as long as the property retains some economically viable use. That is not the law.

The majority's approach here also conflicts with a vast body of zoning cases dealing with prior non-conforming uses. Those cases show how courts and legislatures have been reluctant to mandate changes to existing uses of property, even where, as in Wisconsin, the "spirit of zoning is to restrict and eventually *eliminate*" non-conforming use. *Waukesha County v. Pewaukee Marina, Inc.*, 522 N.W.2d 536, 542 (Wis. App. 1994) (use that existed when ordinance was enacted is protected as a legal non-conforming use); *Town of Yorkville v. Fonk*, 88 N.W.2d 319, 322 (Wis. 1958) (a vested right existed only for use of the property that had begun by the time the law was changed, not for partially completed extensions of non-conforming use to new property); see also *State ex. rel. Covenant Harbor Bible Camp v. Steinke*, 96 N.W.2d 356, 361 (Wis. 1959) ("Legislatures have generally refrained from requiring an immediate discontinuance of non-conforming uses presumably because of doubt that such a provision would be constitutional."). All of those cases are misguided if this retroactive prohibition on an existing and lawful use is permitted without compensation.

I grant that there have been cases in which courts have allowed prohibitions on existing land uses without compensation. See *Penn Central,* 438 U.S. at 126-27 (reviewing cases in which the Supreme Court had upheld prohibitions on established uses). But those cases almost always involved some "noxious" or nuisance use of the property. The cases that went the farthest in allowing prohibitions on existing land uses predated modern regulatory takings jurisprudence and its focus on investment-backed expectations. See *Goldblatt v. Town of Hempstead*, 369 U.S. 590, 596 (1962) (ordinance regulating mining below the water table was valid regulation); *Hadacheck v. Sebastian*, 239 U.S. 394 (1915) (upholding ordinance prohibiting operation of otherwise lawful brickyard business that legislature found inconsistent with neighboring uses); *Mugler v. Kansas*, 123 U.S. 623 (1887) (outlawing an established brewery was not a taking when the entire state was going "dry"). *Goldblatt* probably went farther than any other case in allowing a local government to prohibit an existing use, but it was justified by the later growth of residences around the mining operation, and most important, there was no actual evidence of loss of value. 369 U.S. at 594 & n.3.

These nuisance-type cases are the exception that proves the rule of the importance of the difference between existing uses and future uses. As Professor Serkin has explained: "Applying the nuisance exception, the government can regulate away a hazardous or injurious activity without paying compensation. . . . Framed as an exception to takings liability, the nuisance inquiry . . .

assumes and reinforces the background rule that existing uses cannot be eliminated unless they are nuisances." Christopher Serkin, "Existing Uses and the Limits of Land Use Regulations," 84 New York Univ. L. Rev. 1222, 1240 (2009).[4]

In fact, the result in *Penn Central* itself turned on the fact that the regulatory change did not interfere at all with the existing uses of the Grand Central Terminal property. The Supreme Court explained that the New York City historic landmark designation of the terminal did not effect a taking where it did not interfere with the present, established use of the terminal, and where the owners could "continue to use the property precisely as it has been used for the past 65 years." 438 U.S. at 136.

Since *Penn Central*, the Supreme Court has not held that a regulatory change prohibiting what had been a lawful, existing use of property was not a compensable

---

[4] Professor Serkin's article provides detailed support for my description of the special protection that takings law and related aspects of property law provide for existing uses. It's only fair to add, however, that the principal point of his article is that he believes existing law provides *too much* protection for existing uses, and that governments should have much more power to prohibit or modify existing uses without paying compensation. See 84 N.Y.U. L. Rev. at 1223-26. For the reasons I explain in this opinion, I do not believe we can predict that the Wisconsin Supreme Court is ready to abandon that degree of protection for existing uses of property.

taking. Such cases no longer arise because the law is so clear. Instead, the Supreme Court's more recent cases show that the threshold for a regulatory taking is lower, and can apply to denial of a *planned* use if the owner can show sufficient investment in its expectation that it could use the property in the planned way. See *Palazzolo*, 533 U.S. at 616 (remanding for further consideration of the *Penn Central* factors in analysis of wetlands regulation on planned development for coastal property); *Lucas*, 505 U.S. at 1019 n.8 ("as we have acknowledged time and again, '[t]he economic impact of the regulation on the claimant and . . . the extent to which the regulation has interfered with distinct investment-backed expectations' are keenly relevant to takings analysis generally") (citation omitted).

The majority relies upon *Zealy v. City of Waukesha*, 534 N.W.2d 917, 920 (Wis. App. 1995), for the proposition that a regulatory or constructive taking will be found only where a government regulation has "rendered the property practically useless for all reasonable purposes." The first problem with this reliance is that the Wisconsin Supreme Court reversed the cited decision. See *Zealy v. City of Waukesha*, 548 N.W.2d 528 (Wis. 1996). The Wisconsin Supreme Court decision held that a local government had not effected a compensable taking by classifying a portion of the plaintiff's property as a wetlands conservancy district that could no longer be developed for residential use. The state supreme court admittedly invoked the often-stated "rule" that a regulation must deny the landowner all or substantially

all practical uses of a property to effect a compensable taking. *Id*. at 531. The cases it cited for this proposition, however, involved prohibitions on possible or planned new uses, not prohibitions on established and lawful uses. In holding that there had been no taking, more-over, the state supreme court emphasized that the wetlands in question could still be used for their lawful and historical use as farmland. *Id*. at 534.

Then the Wisconsin Supreme Court turned to the owner's argument that he had a vested right in the prior zoning law that had allowed for residential use. The court rejected that claim on grounds that are telling for this case. There was no vested right in the prior zoning itself, and the owner in *Zealy* had no vested right in future residential development because he had not "shown that he made any expenditures in reliance on the zoning, nor has he ever submitted an application for a building permit proposing a residential use of the land." *Id*. at 534-35, citing *Lake Bluff Housing Partners*. Bettendorf's takings claim is supported by precisely the sort of facts that were missing in *Zealy*: he has made expenditures for commercial use of the property that the local government now insists must end.

The *Lake Bluff Housing Partners* opinion provides a thorough guide to Wisconsin's law of vested rights. See *Lake Bluff Housing Partners*, 540 N.W.2d at 194-97. The state supreme court's discussion focuses on when an owner's plans for a *new* use have gone so far as to give rise to vested rights that cannot be taken by a change in zoning law. By the force of that reasoning, there can

be no doubt that an owner has vested rights in an already existing and lawful use of the property.

These discussions of vested rights under Wisconsin law pertain to zoning law, and the premise is that a local government cannot change zoning on a property so as to prohibit an already-existing use or a planned use in which the owner has vested rights. See Wis. Stat. §59.69(10)(a) (zoning ordinances "may not prohibit the continuance of the lawful use of any building, premises, structure, or fixture for any trade or industry for which such building, premises, structure, or fixture is used at the time that the ordinances take effect"). But the link to the state constitutional takings clause is clear. See, *e.g.*, *Town of Cross Plains v. Kitt's Field of Dreams Korner, Inc.*, 775 N.W.2d 283, 288 (Wis. App. 2009), citing *State ex rel. Covenant Harbor Bible Camp v. Steinke*, 96 N.W.2d 356 (Wis. 1959) ("protection of lawful nonconforming uses . . . arises out of the concern that the retroactive application of zoning ordinances would render their constitutionality questionable").

The potential injustices that could result from the majority's decision today can be illustrated by considering some hypothetical scenarios: Suppose zoning allows high-rise multi-family residences on a property. After an apartment building is built at great expense, the local government or a state court decides the zoning for the site was invalid, so the building cannot be occupied by more than one family. Wouldn't that be a compensable taking? Or suppose zoning is amended to allow a steel mill on a site. The owner and investors

pour several hundred million dollars into construction and begin operations. Neighboring residents and businesses then find the noise and odor to be worse than they expected, and they convince the local government to revoke the zoning that authorized the steel mill. Wouldn't that also be a compensable taking? I do not see a principled distinction between those examples and the retroactive change in the law that the majority's decision allows here without compensation to the affected property owner.

I do not mean to suggest that local government can *never* change the law to prohibit an existing lawful use without effecting a compensable taking of property. The United States Supreme Court has avoided such a bright line, as have the Wisconsin courts. But apart from the nuisance or noxious use cases, such cases are at best rare. A finding of no taking in such a case requires at the very least a careful application of the *Penn Central* balancing test. In this case, perhaps a full record would reveal new facts that would cast the entire controversy in a different light. In the end, however, I do not think we can decide on the bare pleadings that plaintiff Bettendorf has no viable state law takings claim. I would reverse the district court's dismissal of plaintiff's state law takings claim and would remand, either for further proceedings in the district court or for dismissal without prejudice so that plaintiff could pursue relief in the state courts. See 28 U.S.C. § 1367(c) (authorizing district court to decline to exercise jurisdiction over state law claims within the court's supple-

mental jurisdiction). Finally, I note that our prediction of Wisconsin law is not binding on Wisconsin courts. Perhaps the Wisconsin Supreme Court will have an occasion to consider these questions in the near future.[5]

---

[5] Lurking in this case are two issues that sharply divided the Supreme Court of the United States without producing a majority opinion in *Stop the Beach Renourishment, Inc. v. Florida Dep't of Environmental Protection*, 130 S. Ct. 2592 (2010). The issues are first, whether a court decision can effect a compensable taking of property, and second, if so, what role federal courts might play in reviewing those decisions. Justice Scalia's plurality opinion for four Justices concluded that a state court decision could effect a compensable taking by reversing well-established property law, and that such issues could be brought to the Supreme Court but probably not to lower federal courts. See 130 S. Ct. at 2602, 2609 (plurality opinion). Four other Justices declined to reach the first issue and pointed out the potential for significant change in the roles of federal courts in deciding state property law. See *id*. at 2613-18 (Kennedy, J., concurring in the judgment); *id*. at 2618-19 (Breyer, J., concurring in the judgment). I do not think we need to reach these issues in this case because I do not think the state court decision itself effected any taking of Bettendorf's property. It is the county's threats to enforce the revised zoning law that may have already effected a temporary taking of his property and the county's efforts to enforce the court decision that could effect a permanent taking.